JOHN A. LOWELL & others *vs.* CITY OF BOSTON.

The St. of 1872, c. 364, authorizing the city of Boston to issue bonds and lend the proceeds on mortgage to the owners of land, the buildings upon which were burned by the great fire of 1872, is unconstitutional.

BILL IN EQUITY by John A. Lowell and nine others, taxable inhabitants of the city of Boston, praying that the defendants might be restrained from issuing bonds under the St. of 1872, c. 364,* on the ground that the statute was unconstitutional.

* The first section authorizes the city of Boston to issue bonds, payable in not more than fifteen years, for an amount not exceeding $20,000,000, bearing interest at not more than five per cent. for those payable in gold, and not more than six per cent. for those payable in legal tender notes.

The second section provides for the appointment of three commissioners by the mayor and aldermen.

The third and fourth sections are as follows:

" SECTION 3. The duties and powers of such commissioners shall be as follows: they are hereby authorized to loan, in a safe and judicious manner, the

The defendants demurred for want of equity, and the case was heard and reserved by *Gray*, J., upon bill and demurrer, for the consideration of the full court.

proceeds of the bonds hereby authorized to be issued, in such sums as they shall determine, to the owners of land, the buildings upon which were burned by the fire in said Boston, on the ninth and tenth days of November, in the year eighteen hundred and seventy-two, upon the notes or bonds of such owners, secured by first mortgages of said land; said mortgages to be conditioned that the rebuilding shall be commenced within one year from the first day of January, in the year eighteen hundred and seventy-three, and said commissioners to have full power to apply the proceeds of said bonds in making said loans in such manner, and to make such further provisions, conditions and limitations, in reference to said loans, and securing the same, as shall be best calculated, in their judgment, to insure the employment of the same in rebuilding upon said land burned over, and the payment thereof to the said city. The loans upon such mortgages shall be payable in not more than ten years from date, and at a rate of interest of seven per centum per annum, payable semi-annually. When said loans are made, and the mortgages to secure them are completed, the said mortgages, notes, bonds and securities connected therewith are to be delivered by said commissioners to the treasurer of the city of Boston. The bonds hereby mentioned are to be negotiated and sold by and under the direction of said commissioners; but all proceeds received from such negotiation and sale are to be paid to the treasurer of said city. Said commissioners shall have authority to withhold the payment of any portion of a loan agreed to be made to an owner of land burned over by said fire, when it shall be necessary in their judgment so to do, to insure the speedy rebuilding on said land.

" Section 4. A sinking fund shall be established for the payment of the bonds issued under this act, which shall consist of all premiums from the sale of said bonds above their par value, of all receipts of interest upon loans made under the authority of this act, over and above the interest paid on said bonds, and of all payments of the loans made under the authority of this act. The city treasurer shall keep an account of all sums received for said sinking fund, and the same shall be invested from time to time under the direction and authority of the commissioners of the sinking fund of the city of Boston; and the receipts of income from the sums so invested shall be held as a part of said fund, and be reinvested in the same manner as the principal. The commissioners of said sinking fund are authorized to invest any part thereof in buying and cancelling the bonds issued by virtue of this act. And when the bonds of said city, authorized by this act, become due and payable, said sinking fund shall be used and applied to the payment thereof."

Other sections of the act provide that the city treasurer shall have the custody of the proceeds of the bonds, of all securities taken by the commis-

*B. R. Curtis & J. G. Abbott,* for the defendants. A statute is presumed to be constitutional. *Talbot* v. *Hudson,* 16 Gray, 417, 422. *Opinion of Justices,* 8 Gray, 21. *Commissioners of Inland Fisheries* v. *Holyoke Water Power Co.* 104 Mass. 446, 449. *Wellington, petitioner,* 16 Pick. 87, 96. *Sears* v. *Cottrell,* 5 Mich. 251, 257–261. *Tyler* v. *The People,* 8 Mich. 320, 333. *Twitchell* v. *Blodgett,* 13 Mich. 127, 152. *People* v. *Mahaney,* Ib. 481, 501. *Hazen* v. *Essex Co.* 12 Cush. 475, 478. *Booth* v. *Woodbury,* 32 Conn. 118, 128. *Broadhead* v. *Milwaukee,* 19 Wis. 624, 652.

The St. of 1872, *c.* 364, is not repugnant to the provision of the Constitution which authorizes the Legislature to lay " proportional and reasonable assessments, rates and taxes upon all the inhabitants of, and persons resident and estates lying within the Commonwealth." Const. of Mass. *c.* 1, § 1, Art. IV.

The statute interferes in no way with private property, either directly or indirectly. The strongest statement that can be made is, that, under certain contingencies, the property and citizens of Boston may be subjected to a tax at some future time, by reason of this statute. But subjecting property to be taxed is not in conflict with the provision of the Constitution that private property should not be taken for public purposes, except by providing compensation. If imposing a tax and taking property for its payment was a taking of private property, within the meaning of the Constitution, then all taxation would be forbidden. *Hingham & Quincy Bridge & Turnpike Co.* v. *County of Norfolk,* 6 Allen, 353, 358.

The main questions in the case are these: Can there be such a destruction of property by fire in the capital city of the State, .he main seat and centre of its wealth, industry, commerce and business, the prosperity and advance of which are so intimately connected with its own, that the one cannot be touched without seriously affecting the other, as to justify the State in

---

sioners, and of the sinking fund; that records shall be kept by the commissioners and the treasurer; that no loan shall be made after January 1, 1874 and that the act shall not take effect until accepted by the city council.

lending money to those whose property has been destroyed, upon ample security, to enable them to restore the city to its former condition ? Can there be so general a calamity and destruction by fire, in a city owning more than a third of the taxable property of the State, and paying more than a third of the taxes for public purposes, as would justify the State, upon prudential considerations, in lending a helping hand for the purpose of preserving her own resources and the mainsprings of her own prosperity ? Can there be a destruction of property in such a city, by-fire, so serious and calamitous as to interfere with the business of the people, the interests of labor, and the finances of the whole community, to such a degree as to justify the Legislature in bringing to the aid of the sufferers a loan from the State, to avert some, at least, of the great public loss and suffering that would be occasioned by such a calamity ?

The statement of these questions carries with it their answer. There might be so general a calamity, produced by the destruction of property by fire in Boston, as to require a loan of money by the State as a measure of self-preservation.

The primary object of the statute is not to benefit and aid private persons. Its purpose and end are strictly of a public nature ; to restore and increase the taxable property and resources of the State ; to prevent and guard against the great evils and losses arising from so great and general a calamity in embarrassing business and industry, deranging finances, and seriously lessening the wealth and prosperity of a large and most important part of the whole people, and interfering with their comfort, happiness and progress.

If this act presented the case of a gift even, to the persons whose property had been burned, (as was the case of a remission of taxes after the fire in Boston in 1683,) the court could not declare it void, unless it could see clearly and palpably that the gift could subserve no public purpose and end, directly or indirectly, and by no possibility, advance any public interest. *Broadhead* v. *Milwaukee*, 19 Wis. 624, 652. *Booth* v. *Woodbury*, 32 Conn. 118, 128. It is sufficient that the object to be accomplished was within the legislative authority ; the court cannot enter upon the

discussion whether the means used, so that they are not in con-
flict with the Constitution, are the best, or even wise and expe-
dient; th*a*t is solely for the Legislature.

In almost any case of the exercise of power by the Legislature
for objects of a public nature, individuals are benefited peculiarly
and beyond the general public. Such is the case with mill-own-
ers, and with railroad, canal and turnpike corporations.

If the State could issue these bonds, it could authorize the city
of Boston to issue them. *Freeland* v. *Hastings*, 10 Allen, 570,
579. *Merrick* v. *Amherst*, 12 Allen, 500, 506. *Dorgan* v. *Bos-
ton*, Ib. 223, 236. *Heyward* v. *New York*, 3 Seld. 314. *Ding-
ley* v. *Boston*, 100 Mass. 544, 557.

The statute is within the power granted to the Legislature to
make all wholesome and reasonable laws for the good and wel-
fare of this Commonwealth and the subjects thereof.

Before the adoption of the Constitution, towns were authorized
by usage and direct grant, to exercise, and did exercise, almost
the whole power of government, except in criminal matters.
Anc. Chart. 195. *Commonwealth* v. *Roxbury*, 9 Gray, 451, 503
note.

The Constitution recognized towns, but made no provision as
to their powers; the Legislature, from time to time, has given
them general powers. In almost all the cases arising on the pow-
ers of towns, the question has been whether the act done was
within the power granted, not whether the Legislature had the
right to grant the power.

Among the powers given to towns are some that might be as
strongly objected to as that given by the statute in question.
Thus towns are authorized to raise money for procuring the writ-
ing and publishing of town histories, and for destroying noxious
animals; Gen. Sts. *c.* 18, § 10; for erecting monuments to sol-
diers killed in the War of the Rebellion, and decorating their
graves; Sts. of 1864, *c.* 100; 1870, *c.* 169; for the celebration
of holidays and providing armories for military companies, plant-
ing shade trees, and establishing libraries; Sts. 1861, *c.* 165,
1866, *c.* 222; 1869, *c.* 381. They are also authorized to sub-
scribe to the stock of railroads. St. 1870, *c.* 325, § 3.

The rule of construction to be deduced from the decided cases would seem to be that the Legislature, under their general power to make wholesome laws for the welfare of the people, can grant any power to a town or city, not repugnant to an express provision of the Constitution, which they may deem beneficial to it; and if the same is accepted and assented to by the town or city, on the ground of its conferring a benefit, then, although it may increase the burden of taxation, the courts will not interfere. *Merrick* v. *Amherst*, 12 Allen, 500. *Freeland* v. *Hastings*, 10 Allen, 570. *Nelson* v. *Milford*, 7 Pick. 18. *Bancroft* v. *Lynnfield*, 18 Pick. 566. *Hadsell* v. *Hancock*, 3 Gray, 526. *Fuller* v. *Groton*, 11 Gray, 340. So, also, many statutes authorizing certain towns to contribute money towards the erection of county buildings therein, such as court-houses, jails, houses of correction, and the like.

The right of the Legislature to authorize the imposition of a tax, or to take private property for a purpose which may be only beneficial to a city or town, or even a portion of one, is too well established to be questioned. Upon it depends the whole system of laws in reference to drains, sewers, draining meadows, laying out private ways, and a large number of special acts, such as the one authorizing the taking down a dam and destroying a mill on Concord River to drain the meadows above it. *Talbot* v. *Hudson*, 16 Gray, 417, 422. The whole system of pauper laws, and the establishing directly, or authorizing towns and cities to establish, hospitals, depends upon the same principles as does the law under consideration.

*D. Foster*, for the petitioners, besides the cases cited in the opinion, referred to *Boston & Lowell Railroad Co.* v. *Salem & Lowell Railroad Co.* 2 Gray, 1, 37; *Bradley* v. *New York & New Haven Railroad Co.* 21 Conn. 294, 306; *Pumpelly* v. *Green Bay Co.* 13 Wall. 166, 177; *City of Covington* v. *Southgate*, 15 B. Mon. 491, 498; *Garrard County Court* v. *Kentucky River Navigation Co.* 10 Am. Law Reg. (N. S.) 151; *Opinion of Justices*, 58 Maine, 590, 616 · *Gaskill* v. *Dudley*, 6 Met. 546, 551; *Board of Commissioners of Knox County* v. *Aspinwall*, 24 How. 376; *Stowell* v. *Flagg*, 11 Mass. 364; *Fuller* v. *Chicopee Manuf. Co.*

16 Gray, 43 ; *Flagg* v. *Flagg*, Ib. 175 ; *Ellis* v. *Marshall*, 2 Mass. 268, 276 ; *Tyson* v. *School Directors of Halifax*, 51 Penn. State, 9 ; *Rogers* v. *Burlington*, 3 Wall. 654 ; *Mitchell* v. *Burlington*, 4 Wall. 270 ; *Gelpcke* v. *Dubuque*, 1 Wall. 175 ; *Bloodgood* v. *Mohawk & Hudson Railroad Co.* 18 Wend. 65 ; *Sharpless* v. *Philadelphia*, 21 Penn. State, 147 ; *Whiting* v. *Sheboygan & Fond du Lac Railroad Co.* 25 Wis. 167 ; *Hanson* v. *Vernon*, 27 Iowa, 28 ; *People* v. *Salem*, 20 Mich. 452 ; *Hampshire* v. *Franklin*, 16 Mass. 76, 84 ; *Wilkinson* v. *Leland*, 2 Pet. 627, 657 ; *Jenkins* v. *Andover*, 103 Mass. 94 ; *Curtis* v. *Whipple*, 24 Wis. 350 ; *Philadelphia Association* v. *Wood*, 39 Penn. State, 73.

WELLS, J. This is a proceeding under the provisions of the Gen. Sts. *c.* 18, § 79, to restrain the city of Boston from issuing its bonds for the purpose of raising a fund to be appropriated to the object of rendering aid, by way of loans, in rebuilding upon that portion of the city which was burned over in November 1872. The issue of bonds for that purpose, to an amount not exceeding $20,000,000, was expressly authorized by the St. of 1872, *c.* 364. The question, therefore, is distinctly presented whether the authority thus conferred upon the city is contrary to the provisions of the Constitution of the Commonwealth.

The issue of bonds by the city, whatever provision may be made for their redemption, involves the possible and not improbable consequence of a necessity to provide for their payment by the city. The right to incur the obligation implies the right to raise money by taxation for payment of the bonds ; or, what is equivalent, the right to levy a tax for the purposes for which the fund is to be raised by means of the bonds so authorized.

It is a question, not of municipal authority, but of legislative power. The point of difficulty is not as to the distribution of the burden by allowing it to be imposed upon a limited district within the State ; but as to the right of the Legislature to impose or authorize any tax for the object contemplated by this statute.

The power to levy taxes is founded on the right, duty and responsibility to maintain and administer all the governmental functions of the State, and to provide for the public welfare. To

justify any exercise of the power requires that the expenditure which it is intended to meet shall be for some public service, or some object which concerns the public welfare. The promotion of the interests of individuals, either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is, in its essential character, a private and not a public object. However certain and great the resulting good to the general public, it does not, by reason of its comparative importance, cease to be incidental. The incidental advantage to the public, or to the State, which results from the promotion of private interests, and the prosperity of private enterprises or business, does not justify their aid by the use of public money raised by taxation, or for which taxation may become necessary. It is the essential character of the direct object of the expenditure which must determine its validity, as justifying a tax, and not the magnitude of the interests to be affected, nor the degree to which the general advantage of the community, and thus the public welfare, may be ultimately benefited by their promotion.

The principle of this distinction is fundamental. It underlies all government that is based upon reason rather than upon force. It is expressed in various forms in the Constitution of Massachusetts. In Art. XI. of *c.* 2, § 1, by restricting the issuing of moneys from the treasury to purposes of " the necessary defence and support of the Commonwealth; and for the protection and preservation of the inhabitants thereof, agreeably to the acts and resolves of the General Court." In Art. IV. of *c.* 1, § 1, by declaring the purposes, for which the power of taxation, in its various forms, may be exercised by the General Court, to be " for the public service, in the necessary defence and support of the government of the said Commonwealth, and the protection and preservation of the subjects thereof." The purport and scope of these provisions are made more distinct, and the essential idea upon which they rest is disclosed by reference to the preceding Declaration of Rights, by which the theory and purpose of this frame of government were set forth by its founders. Art. X. declares, "Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property,

according to standing laws.   He is obliged, consequently, to con-
tribute his share to the expense of this protection ; to give his
personal service, or an equivalent, when necessary : but no part
of the property of any individual can, with justice, be taken from
him, or applied to public uses, without his own consent, or that of
the representative body of the people.   In fine, the people of this
Commonwealth are not controllable by any other laws than those
to which their constitutional representative body have given their
consent.   And whenever the public exigencies require that the
property of any individual should be appropriated to public uses,
he shall receive a reasonable compensation therefor."

The power of the government, thus constituted, to affect the
individual in his private rights of property, whether by exacting
contributions to the general means, or by sequestration of specific
property, is confined, by obvious implication as well as by express
terms, to purposes and objects alone which the government was
established to promote, to wit, public uses and the public service.
This power, when exercised in one form, is taxation ; in the other,
is designated as the right of eminent domain.   The two are
diverse in respect of the occasion and mode of exercise, but iden-
tical in their source, to wit, the necessities of organized society ;
and in the end by which alone the exercise of either can be justi-
fied, to wit, some public service or use.   It is due to their identity
in these respects that the two powers, otherwise so unlike, are
associated together in the same article.   So far as it concerns the
question what constitutes public use or service that will justify
the exercise of these sovereign powers over private rights of
property, which is the main question now to be solved, this iden-
tity renders it unnecessary to distinguish between the two forms
of exercise, as the same tests must apply to and control in each.
An appropriation of money raised by taxation, or of property
taken by right of eminent domain, by way of gift to an indi-
vidual for his own private uses exclusively, would clearly be an
excess of legislative power.   The distinction between this and
its appropriation for the construction of a highway, is marked
and obvious.   It is independent of all considerations of resulting
advantage.   The individual, by reason of his capacity, enterprise

or situation, might be enabled to employ the money or property thus conferred upon him in such a manner as to furnish employ-ment to great numbers of the community, to give a needed im-pulse to business of various kinds, and thus promote the general prosperity and welfare. In this view, it might be shown to be for the public good to take from the unenterprising and thriftless their unemployed capital and entrust it to others who will use it to better advantage for the interests of the community. But it needs no argument to show that such an arbitrary exercise of power would be a violation of the constitutional rights of those from whom the money or property was taken, and an unjustifiable usurpation.

In the case of a highway, on the other hand, its direct purpose of public use determines conclusively the question in support of the exercise, both of the right of eminent domain and of taxation, however trifling the advantage to the public compared with that to individuals. The extent or value of the public use, and the wisdom and propriety of the appropriation, are matters to be de termined exclusively by the Legislature, either directly or by its delegated authority. When the power exists it is not within the province of the court to interfere with its exercise, by any inquiry into its expediency.

The two instances, above referred to, illustrate the sense in which the furthering of the public good by promotion of the in-terests of many individuals, differs from a public service. A public service may or may not be productive, practically, of public advantage. Resulting advantage to the public does not of itself give to the means by which it is produced the character of a public service.

There are, indeed, many cases in which the sovereign power of government is exercised to affect private rights of property in favor of private parties, either individuals or corporations. Most conspicuous among these are turnpikes and railroads ; in whose favor this right of eminent domain is frequently exercised. Pri-vate rights are thus taken and transferred, not to the State, but to the private corporation ; and the compensation to the persons in-jured, required by the Constitution, is also rendered from the cor·

poration. Such an appropriation of property is justified, and can only be justified, by the public service thereby secured in the increased facilities for transportation of freight and passengers, of which the whole community may rightfully avail itself. The franchises of the corporation are held charged with this duty and trust for the performance of the public service, for which they were granted. *Commonwealth* v. *Wilkinson*, 16 Pick. 175. *Same* v. *Boston & Maine Railroad*, 3 Cush. 25, 45. *Old Colony & Fall River Railroad Co.* v. *County of Plymouth*, 14 Gray, 155, 161.

This right of eminent domain is often allowed to be exercised in favor of private aqueduct companies. Here, too, the public service, intended as the object of the grant of the right, is obvious. And although the interests of the aqueduct company are ordinarily relied upon to secure the proper performance of the service, yet, in case of any failure or abuse, the obligation may doubtless be otherwise enforced. *Lumbard* v. *Stearns*, 4 Cush. 60.

The mill acts, so called, are often referred to as authorizing the exercise of the right of eminent domain by private parties for their exclusive private benefit. And the language of the court, used *arguendo*, has been sometimes such as to imply that the growth and prosperity of manufacturing and other industrial enterprises were of such importance to the public welfare, as to justify the exercise of the right of eminent domain in their behalf, as a public use. *Boston & Roxbury Mill Co.* v. *Newman*, 12 Pick. 467. *Hazen* v. *Essex Co.* 12 Cush. 475, 478. *Talbot* v. *Hudson*, 16 Gray, 417, 426.

That mills for the sawing of lumber for purposes of building, grinding grain for food, and the manufacture of material for clothing, may be of such necessity to a community, especially in the early settlement of a country, as to make their establishment a provision for a public service, we do not question. It is doubtless within the power of the Legislature to declare the existence of a public exigency for the establishment of a mill, for which the right of eminent domain may properly be exercised; as in the case of the Boston & Roxbury Mill Corporation, and the Salem

Mill-dam Corporation. What may be the limits of legislative power in that direction, and whether there are any limits except in the sound discretion of the Legislature, it is needless now to inquire. We are satisfied that the mill acts are not founded upon that power, and do not authorize its exercise.

The advantages to be derived from a running stream by the several riparian proprietors, are of natural right. Each one may make use of its waters, as they flow through his lands, in a reasonable manner, for such purposes as they are adapted to serve. In order that each may have his opportunity in turn, each is entitled to have the water allowed to flow to and from his land as it has been accustomed to flow, with only such modifications as result from such reasonable use. Hence, all proprietors upon a stream, from its source to its mouth, have, in a certain sense, a common interest in it, and a common right to the enjoyment of all its capacities. Among those capacities no one is more important than that of the force of the current to supply power for the operation of mills. To make that force practicably serviceable requires a considerable head and fall at the point where it is to be applied; often more than can be gained within the limits of one proprietor. The use of the stream in this mode has always been regarded as a reasonable use, notwithstanding the effect of the dam, by which the head is created, to retard the water in its flow to the proprietor below, and to set it back and thus diminish or destroy the force of the current above. One who thus appropriates the force of the current is in the enjoyment of a common right, in which he is protected, although he may thereby prevent a like use subsequently by the proprietor above. *Hatch* v. *Dwight*, 17 Mass. 289, 296. *Cary* v. *Daniels*, 8 Met. 466. *Gould* v. *Boston Duck Co.* 13 Gray, 442. But this protection extends no farther than to justify the appropriation of a part of that quality of the stream, which, until so appropriated, is common to all. It does not justify any, even the least, injury to land outside the channel. Without some law to control, the mill owner would be exposed, not merely to the liability to make just compensation for injuries thus occasioned, but to harassing suits for damages and to abatement of his dam as causing a nuisance. This liabil

ity and the inevitable controversies growing out of conflicting rights in the stream itself, tending to defeat all advantageous use of its power, led to the adoption of laws regulating and protecting the beneficial use of streams for mill purposes. The St. of 1795, *c.* 74, is introduced by the recital, " Whereas the erection and support of mills, to accommodate the inhabitants of the several parts of the State, ought not to be discouraged by many doubts and disputes, and some special provisions are found necessary relative to flowing adjacent lands and mills held by several proprietors." But there is no public service secured through the mill acts, except so far as it may result incidentally, and as the inducements of private interest may lead mill owners to devote their mills to purposes favorable to the public accommodation. The same rights and protection are secured to all who may be possessed of sites for mills, whatever the purpose for which their mills may be designed, and however useless for all purposes of public accommodation or advantage. There is no discrimination in this respect, and no provision to secure any public service that may be supposed to have been contemplated. Further than this, each proprietor is allowed to avail himself of the rights secured by the mill acts, in his own mode and for his own purposes, at his own discretion, without the intervention of any public officer or other tribunal or board, to whom such a governmental function as the exercise of the right of eminent domain is ordinarily entrusted, when not under the special direction of the Legislature itself.

A consideration, still more conclusive to this point, is, that in fact no private property, or right in the nature of property, is taken by force of the mill acts, either for public or private use. They authorize the maintenance of a dam to raise a head of water, although its effect will be to overflow the land of another proprietor. This right of flowage is sometimes inaccurately called an easement. *Hunt* v. *Whitney*, 4 Met. 603. *Talbot* v. *Hudson*, 16 Gray, 417, 422, 426. But it is not so. It confers no right in the land upon the mill owner, and takes none from the land owner. *Murdock* v. *Stickney*, 8 Cush. 113. *Storm* v. *Manchaug Co.* 13 Allen, 10. In *Murdock* v. *Stickney*, Chief Justice Shaw remarks in reference to the mill acts, " The prin-

ciple on which this law is founded is not, as has sometimes been supposed, the right of eminent domain, the sovereign right of taking private property for public use. It is not in any proper sense a taking of the property of an owner of the land flowed, nor is any compensation awarded by the public." In *Bates* v. *Weymouth Iron Co.* 8 Cush. 548, 553, he says, " It is a provision by law, for regulating the rights of proprietors, on one and the same stream, from its rise to its outlet, in a manner best calculated, on the whole, to promote and secure their common rights in it." Similar declarations are made in *Fiske* v. *Framingham Manuf. Co.* 12 Pick. 68. *Williams* v. *Nelson*, 23 Pick. 141.

This regulation of the rights of riparian proprietors, both in respect to the stream and to their adjacent lands, liable to be affected by its use, involves no other governmental power than that " to make, ordain and establish all manner of wholesome and reasonable orders, laws, statutes and ordinances," as the General Court " shall judge to be for the good and welfare of this Commonwealth, and for the government and ordering thereof, and of the subjects of the same." Const. of Mass. *c.* 1, § 1, Art. IV.

All individual rights of property are held subject to this power, which alone can adjust their manifold relations and conflicting tendencies. The absolute right of the individual must yield to and be modified by corresponding rights in other individuals in the community. The resulting general good of all, or the public welfare, is the foundation upon which the power rests, and in behalf of which it is exercised; whether by restricting the use of private property in a manner prejudicial to the public; *Commonwealth* v. *Alger*, 7 Cush. 53; or by imposing burdens upon it for the protection or convenience in part of the public; *Goddard, Petitioner*, 16 Pick. 504. *Baker* v. *Boston*, 12 Pick. 184, 193. *Salem* v. *Eastern Railroad Co.* 98 Mass. 131; or by modifying rights of individuals, in respect of their mutual relations, in order to secure their more advantageous enjoyment by each.

It is *pro bono publico* that general provisions of law exist by which joint tenants and tenants in common of houses and mills may require necessary repairs to be made, with indemnity out of the joint rents or income for the cost thereof. *Calvert* v. *Aldrich*, 99 Mass. 74. Upon the same principle one joint tenant is allowed to sever the joint tenancy by conveyance or partition, and thus change the nature of the estate of his co-tenant, as well as his own. *Shaw* v. *Hearsey*, 5 Mass. 521. Gen. Sts. *c.* 136, § 1.

Estates in common may be divided at the suit of any one of the co-tenants ; and if not conveniently or advantageously divisible equally, one may be required to accept less than his full share, with an equivalent in money for the deficiency. *Hagar* v. *Wiswall*, 10 Pick. 152. *Buck* v. *Wolcott*, 13 Gray, 268. And by a recent statute, under certain conditions, the whole may be sold, and the proceeds in money divided instead of the land. St. 1871, *c.* 111.

Upon the same principle, proprietors of wharves, or of general fields, affected by a common interest or a common necessity, are allowed to adopt measures to secure their common advantage, although burdens or restrictions result therefrom which must be shared by the minority, as well as the majority, by whose determination the measures were adopted. Gen. Sts. *c.* 67. *Wright* v. *Boston*, 9 Cush. 233.

No other power was exercised for the construction of drains and sewers, until 1841, when cities and towns were authorized to exercise for that object the power of taxation. St. 1841, *c.* 115. The property in such drains and sewers was by the same act vested in the city or town ; so that there was a public use as well as a public service, for which that power was delegated. The exercise of the right of eminent domain, for the same object, was delegated to the city of Boston, by the St. of 1857, *c.* 225, § 1, and to all other cities and towns by the St. of 1869, *c.* 111.

In the statutes for the improvement of meadows, the provisions for the assessment and collection of the expenses, in form, resemble taxation, and the power exercised over private property is sometimes ascribed to the right of eminent domain. *Talbot* v. *Hudson*, 16 Gray, 417, 428. But there is no taking for public

use. It is a proceeding of a semi-judicial nature, in which all those whose lands are to be affected are joined as parties. The action taken therein relates to that in which all have a common interest, or in reference to which all are affected by a common necessity. That common necessity is met, and that common interest secured, by subjecting the individual rights to such modifications as the commissioners may judge to be most practicable to secure the best advantage of all. The natural conflict of rights which would arise if each were left to insist on his own, regardless of consequences to others, is avoided by the intervention of this common agent, by whom they are adjusted with due regard to the interests of all as well as of each. For this purpose they are treated as owners of a common property. *Coomes* v. *Burt*, 22 Pick. 422.

The commissioners have no power to affect any lands of persons not joined as parties in the proceedings, or to assess upon them any part of the expenses. *Sherman* v. *Tobey*, 3 Allen, 7. *Day* v. *Hulburt*, 11 Met. 321. They are, indeed, authorized to open flood-gates of any mill, or make needful passages through or round any dam, or erect a temporary dam on land of any person, though not a party, and maintain the same as long as necessary, "for the purpose of obtaining a view of the premises, or of the more convenient or expeditious removal of obstructions." This is not sequestration, but simply a temporary subjection of the privileges of the mill owner to the necessities which pertain to the exercise of the general power of regulation over the common rights in the entire stream. It accords with the general principle that the particular right of the individual must yield to the greater right, in the same degree, of the whole.

We find in these statutes no exercise of the right of eminent domain, or of the governmental power of taxation. That which, in form, resembles taxation, is, in effect, only an equitable apportionment, among the parties to the proceedings, of the expenses incurred for their common benefit, by their common agents, or rather by the officers of the tribunal charged by the Legislature with the conduct of those proceedings, which it authorizes for the execution of its wholesome and reasonable orders and laws in that

behalf made and provided. It differs from assessments for drains (*Hildreth* v. *Lowell*, 11 Gray, 345), sidewalks (*Lowell* v. *Hadley*, 8 Met. 180), and street "betterments" (*Jones* v. *Aldermen of Boston*, 104 Mass. 461), not only in the manner in which all persons to be assessed are required to be made parties to the whole proceedings, but also and especially in the absence of any public use or service as the leading and direct object of the expenditure for which it is made.

"The good and welfare of this Commonwealth," for which "reasonable orders, laws, statutes and ordinances" may be made, by force of which private rights of property may be affected, is a much broader and less specific ground of exercise of power than "public use" and "public service." The former expresses the ultimate purpose, or result sought to be attained by all forms of exercise of legislative power over property. The latter imply a direct relation between the primary object of an appropriation and the public enjoyment. The circumstances may be such that the use or service intended to be secured will practically affect only a small portion of the inhabitants or lands of the Commonwealth. The essential point is, that it affects them as a community, and not merely as individuals. Cooley Const. Limit. 531. This distinction is indicated, and recognized as vital, in *Talbot* v. *Hudson*, 16 Gray, 417, 423, 425, and it lies at the foundation of the decision in that case. There was a taking of private property, by direct authority of the Legislature, which the court held to have been intended as an exercise of the constitutional power to take private property for public use, rendering compensation. The main question was, whether the relief of an extensive territory of valuable lands, in a thickly settled agricultural region, from the nuisance of flooding by the waters of a stream, caused by a single dam below, constituted such an object of public concern as to justify the exercise of the power by removing the dam. The court recognized the difficulty that, so far as the removal of the dam benefited each land owner, it was a private use which would not justify the exercise of that power. But the obstruction in the stream injuriously affected "so large a territory, situated in different towns, and owned by a great num-

bei of persons," as to give it the character of a public nuisance, the removal of which "would seem to come fairly within the scope of legislative action." While we do not assent to the suggestions in that opinion, that the general provisions of law for the regulation of mills and the improvement of meadows are based upon the constitutional power to appropriate private property under the right of eminent domain, we accord fully with the judgment rendered and the general principle upon which it is founded.

The same principle is developed in *Dorgan* v. *Boston*, 12 Allen, 223, and *Dingley* v. *Boston*, 100 Mass. 544. The public use, in one case, was in the improvement of the public streets; in the other, in the remedy for a great public nuisance requiring extraordinary measures for its removal. In both there was a great improvement in the character and value of the new buildings erected upon the territory affected, and thus a promotion of the general prosperity and public welfare. This benefit to the community was anticipated, and was doubtless one of the influential inducements to the adoption of the statutes giving authority for the improvements. It was not in this general advantage however, that the justification, under the Constitution, for such an exercise of power was found, but in the direct and special public service.

In *Hazen* v. *Essex Co.* 12 Cush. 475, before referred to, there was a distinct and clear public service declared as the object of the act conferring the power to destroy private property, to wit, the improvement of the navigation of Merrimack River. The case does not rest upon the general benefit from the establishment of mills.

Without such public use or service expressly declared, or implied from the nature of the object of the expenditure, taxation in any form cannot be justified. *Lowell* v. *Oliver*, 8 Allen, 247. *Freeland* v. *Hastings*, 10 Allen, 570. *Dorgan* v. *Boston*, 12 Allen, 223, 240. *Merrick* v. *Amherst*, Ib. 500.

In *Morse* v. *Stocker*, 1 Allen, 150, it was held that an assessment for the expense of a sidewalk in a street which was so by dedication only, and in which no right of way was secured to the party assessed, or to the public by its acceptance or location by the proper authorities, was unconstitutional and void.

There is no public use or public service declared in the statute now under consideration, and we are of opinion that none can be found in the purposes of its provisions. By its terms the proceeds of the bonds, thereby authorized, are to be expended in loans to persons who are or may become owners of land in Boston, "the buildings upon which were burned by the fire in said Boston on the ninth and tenth days of November," 1872. The ultimate end and object of the expenditure, as indicated by the provisions of the statute itself, is "to insure the speedy rebuilding on said land."

The general result may indeed be thus stated collectively, as a single object of attainment; but the fund raised is intended to be appropriated distributively, by separate loans to numerous individuals, each one of which will be independent of any relation to the others, or to any general purpose, except that of aiding individual enterprise in matters of private business. The property thus created will remain exclusively private property, to be devoted to private uses at the discretion of the owners of the land; with no restriction as to the character of the buildings to be erected, or the uses to which they shall be devoted; and with no obligation to render any service or duty to the Commonwealth, or to the city, — except to repay the loan, — or to the community at large or any part of it. If it be assumed that the private interests of the owners will lead them to reëstablish warehouses, shops, manufactories, and stores; and that the trade and business of the place will be enlarged or revived by means of the facilities thus provided; still these are considerations of private interest, and, if expressly declared to be the aim and purpose of the act, they would not constitute a public object, in a legal sense.

As a judicial question the case is not changed by the magnitude of the calamity which has created the emergency; nor by the greatness of the emergency, or the extent and importance of the interests to be promoted. These are considerations affecting only the propriety and expediency of the expenditure as a legislative question. If the expenditure is, in its nature, such as will justify taxation under any state of circumstances, it belongs to the Legislature exclusively to determine whether

it shall be authorized in the particular case ; and however slight the emergency, or limited or unimportant the interests to be promoted thereby, the court has no authority to revise the legislative action.

On the other hand, if its nature is such as not to justify taxation in any and all cases in which the Legislature might see fit to give authority therefor, no stress of circumstances affecting the expediency, importance or general desirableness of the measure, and no concurrence of legislative and municipal action, or preponderance of popular favor in any particular case, will supply the element necessary to bring it within the scope of legislative power.

The expenditure authorized by this statute being for private and not for public objects, in a legal sense, it exceeds the constitutional power of the Legislature ; and the city cannot lawfully issue the bonds for the purposes of the act.

This discussion has, for obvious reasons, taken a somewhat wider range than was required for the decision of the case immediately before us. We have purposely confined it to the consideration of judicial decisions and utterances in Massachusetts ; because the question is of legislative power under the Constitution of this Commonwealth. The recent decision of the Supreme Judicial Court of Maine, however, in the case of *Allen* v. *Jay,* 60 Maine, 124, to which we are referred, is of especial significance and importance from the similarity in the organic law of the two states, and the almost exact identity of the question presented by the facts. It fully sustains the conclusions to which we have been led in this case.

*Demurrer overruled. Injunction ordered.*