CITY OF FROSTBURG ET AL. *v.* JENKINS

[No. 24, September Term, 1957.]

*Decided December 12, 1957.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND and PRESCOTT, JJ.

*Edward J. Ryan,* for appellants.

*William C. Walsh* and *William Walsh,* with whom were *Miles, Walsh & Stockbridge* on the brief, for appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court for Allegany County, restraining the appellants from holding a special election for the purpose of obtaining authority to issue municipal bonds and devote the proceeds to acquiring a site and contributing to the cost of constructing a building to be

12

used by a privately owned manufacturing company. On a bill for declaratory decree filed March 28, 1957, by taxpayers and voters of Frostburg, the Chancellor held that the enabling act and City ordinance were invalid and unconstitutional, on the ground that they authorized the use of public funds for a private purpose.

The Code of Public Local Laws of Allegany County, Art. 1, Sec. 248 (Everstine Ed. 1955), as enacted by Chapter 662, Sec. 103, Acts of 1953, provides:

"INDUSTRIAL DEVELOPMENT. In order to encourage industrial development in the City of Frostburg, the City of Frostburg shall have the power to purchase property and to construct or reconstruct buildings or other structures to be used by manufacturing companies agreeing to locate in Frostburg. The city shall enter into an agreement with any such manufacturing company which shall provide that the company shall purchase the land and buildings and structures by means of installment payments over a period of years not to exceed twenty-five. Until the entire purchase price has been received by the city, the land, buildings, and structures shall remain the property of the City of Frostburg. For the purposes only of this section, the City of Frostburg shall have the power to issue bonds or other certificates of indebtedness, subject in each instance to receiving the prior approval of the voters of the city in a referendum vote. Not more than $100,000.00 in bonds or other certificates of indebtedness may be issued and outstanding at any one time under the provisions of this section."

On March 4, 1957, the City passed Ordinance No. 488, providing for a special election on March 30, 1957, pursuant to the enabling act, to authorize the City to issue bonds in an amount not to exceed $100,000.00, for the purpose of acquiring a site and contributing to the construction of a building to be used by the Cumberland Undergarment Company for the manufacture of lingerie and other garments and ar-

ticles of a like nature, and providing for the cost of said special election. The Ordinance recited that the Company had agreed to operate a factory in Frostburg, if a suitable building were erected for it, to contribute to the cost of said building in excess of $100,000.00, to have the title to said building held in the name of the City until fully paid for, to enter into a contract to purchase the building within twenty-five years, "and to make annual payments under said contract which will total $100,000.00 in twenty-five years, plus interest on deferred payments". The Ordinance contained the usual provisions for notice by the Supervisors of Election, and the manner of holding the election.

The answer admitted the facts alleged in the bill, and further alleged that the issuance of the bonds "will be for the benefit of the citizens and residents of the City of Frostburg and that the issuance of such bonds are for a public purpose and are necessary to obtain industrial sites for the purpose of giving employment to the residents of the City of Frostburg and that by so doing, the said city will obtain income from its taxing authority and the economy of the city will be vitalized by the employment which is given to the residents thereof." It was further alleged that "without this authority being granted, the said city will not be able to compete with other localities to obtain manufacturing sites for employment of the residents of the city who own properties therein and without such employment would become public charges and would not be able to make payment of the taxes which is the lifeblood of the city." The case was submitted upon bill and answer, and a restraining order was passed on March 27, 1957. Thereafter, the bill was amended to pray a permanent injunction against the holding of any election under the enabling act, the answer was amended accordingly, and the Chancellor issued a permanent injunction. Under these circumstances, although the time for the election has expired and the question of the validity of this Ordinance is moot, we think the validity of the enabling act under the amended bill for declaratory relief may properly be considered. Cf. *Lloyd v. Supervisors of Elections*, 206 Md. 36, and *Comrs. of Vienna v. Phillips Co.*, 207 Md. 12, 19.

It is the general rule that the public funds of municipalities cannot properly be devoted to private use, even when expressly authorized by the legislature. 15 *McQuillan, Municipal Corporations* (3rd ed.), § 39.19, p. 33. The exact constitutional source of the prohibition is somewhat obscure. It was once supposed to reside in the Fourteenth Amendment to the Federal Constitution, because of the broad language of *Loan Association v. Topeka*, 20 Wall. (87 U. S.) 655. In that case the court affirmed a judgment in favor of the city, in a suit on its bonds, which had been donated to a manufacturer to induce it to locate in the city, pursuant to statutory authorization. But Mr. Justice Holmes, in his dissent in *Traction Co. v. Mining Co.*, 196 U. S. 239, 260, observed that the decision in the *Loan Association* case was not, and could not have been, rested on the Fourteenth Amendment. In *Albritton v. City of Winona*, 178 So. 799 (Miss.), the state court had before it the validity of a statute authorizing the use of municipal funds to finance a private manufacturing corporation. The court distinguished the case of *Carothers v. Town of Booneville*, 153 So. 670 (Miss.) on the ground that the legislative policy had not been clearly established in the earlier case. It squarely held that the statute did not violate the Fourteenth Amendment. An appeal to the Supreme Court of the United States was dismissed for want of a substantial federal question, 303 U. S. 627. In support of the dismissal the Supreme Court cited, among other cases, *Green v. Frazier*, 253 U. S. 233, and *Carmichael v. Southern Coal Co.*, 301 U. S. 495. In those cases the Court had intimated that, except in the most extreme cases, it would not override the judgment of the state courts and the state legislature as to what is a public, as distinguished from a private, purpose. In the *Carmichael* case, *supra*, (p. 515) the Court said: "Whether the present expenditure serves a public purpose is a practical question addressed to the law-making department, and it would require a plain case of departure from every public purpose which could reasonably be conceived to justify the intervention of a court." Another decision holding that the Fourteenth Amendment is not applicable in a situation like that in the instant case, is *Miller v. Police Jury of Wash-*

*ington Parish,* 74 So. 2d 394 (La.). There a similar scheme for financing new industry was put into effect after an amendment to the state constitution had removed a prohibition against lending credit.

We have noted that the phrase "law of the land" in Article 23 of our Declaration of Rights expresses the same concept as "due process of law" in the Fourteenth Amendment, and that decisions of the Supreme Court in this field are "practically direct authorities." *Home Utilities Co. v. Revere,* 209 Md. 610, 614.

Although Sections 34 and 54 of Article III of the Maryland Constitution were not relied upon below or in this Court, it was suggested in argument that they might bar the extension of credit in the instant case. The prohibition in Section 34, in terms, runs only against the State, and this construction would seem to be supported by the qualified prohibition in Section 54 in the case of the counties. See also Article XI, Section 7, applicable to Baltimore City. But in any event it seems clear since the decisions in *Johns Hopkins University v. Williams,* 199 Md. 382, and *Melvin v. Anne Arundel County,* 199 Md. 402, that the prohibitions of those sections do not bar the use of the State's or a county's credit to obtain funds to be used for gifts to private corporations that serve a public purpose, such as an educational institution and a hospital, respectively. We think it is also significant that in *Finan v. M. & C. C. of Cumberland,* 154 Md. 563, this Court, in approving the extension of municipal credit to a private hospital, did not refer to Sections 34 or 54, although these sections were discussed in the briefs. See also, *Board of Education v. Wheat,* 174 Md. 314, and *Adams v. St. Mary's County,* 180 Md. 550, where local laws authorizing the counties to transport children to private schools were sustained without reference to Sections 34 or 54. This Court simply held there was no violation of Articles 15 or 23 of the Declaration of Rights, or of the Fourteenth Amendment "by taking money of the taxpayers for the use of private institutions", under the circumstances. *Board of Education v. Wheat, supra* (p. 319); *Adams v. St. Mary's County, supra* (p. 556). Cf. *Everson v. Board of Education,* 330 U. S. 1.

The leading Maryland case that laid down the proposition that public funds cannot properly be devoted to a private purpose is *Balto. & E. S. R. Co. v. Spring,* 80 Md. 510 (1895). In that case a legislative act authorized Talbot County to issue bonds and apply the proceeds to the payment of claims against an insolvent railroad for the benefit of local creditors. It was held that this was a private purpose, and a violation of Article 15 of the Declaration of Rights. The Article as it then stood was revised by Chapter 390, Acts of 1914, ratified November 2, 1915, but although it did not, and does not now, in terms limit the taxing power we think it is settled, particularly since the decision in *Finan v. M. & C. C. of Cumberland, supra,* that taxes by whomsoever laid or authorized, can only be imposed to raise money for public purposes. It is also recognized that, with due regard to the legislative prerogative, the courts have a duty to determine whether the particular use is within the scope of the constitutional power.. Cf. *Arnsperger v. Crawford,* 101 Md. 247, 252. But in the application of the principle, it is agreed that "What is a public purpose for which public funds may be expended is not a matter of exact definition; it is almost entirely a matter of general acceptation." *Finan v. M. & C. C. of Cumberland, supra* (p. 565). We may add that the line of demarcation is not immutable or incapable of adjustment to changing social and economic conditions that are properly of public and governmental concern. Cf. *Green v. Frazier, supra.* Perhaps the best illustration of change is to be found in the field of social security, until recently not considered a governmental responsibility.

The only declaration of public policy in the enabling act before us is the statement that the power is granted "in order to encourage industrial development". The legislative purpose, however, is somewhat amplified in the allegations of the answer, which are admitted for the purpose of this case, and we might, indeed, take judicial notice of the fact that the location of new industry in a municipality furnishes employment and measurably increases the resources of the community and its financial well-being. As the Supreme Court recognized in the *Carmichael* case, *supra,* the relief of un-

employment is a legitimate public purpose. The fact that incidental benefits are passed on to the locating corporation is not fatal, if there are substantial public benefits to support the action taken. Cf. *Herzinger v. City of Baltimore*, 203 Md. 49, 60.

In the instant case there are obvious benefits passing to the private corporation, and enuring to the benefit of its stockholders. One benefit is the financing of its building program at a favorable interest rate. It is common knowledge that municipal bonds can usually be floated at a lower yield than industrial bonds, because of the tax immunities, and because they are supported by tax revenues instead of earnings. Although interest rates are not fixed in the Ordinance, we assume that the scheme contemplates that the saving be passed on to the corporation under its contract to purchase the land and building in installments in twenty-five years. Another benefit may arise from the fact that title will remain in the City during that period. We assume that the property so held would not be subject to property taxes. But whether these private benefits outweigh the public benefits accruing from the location of the plant within the municipality seems to us to be primarily a legislative rather than a judicial problem.

The attraction of new industries to this State, by means of tax exemptions, has been recognized as within the legislative power over a long period of years. See *Kimball-Tyler v. Balto. City*, 214 Md. 86, 90, reciting the history of the former Baltimore City tax exemption, and *Carroll County v. Shriver Co.*, 146 Md. 412, 418. We see no real difference between the tax exemptions there created, and that in the instant case. True, those exemptions were made applicable to all manufacturers as a class, whereas in the instant case it only applies at this time, as a practical matter, to one. Yet this is due solely to the limitation upon the funds available. The only novel feature of the present scheme is the extension of municipal credit as an aid to the financing of the building program. Such aid is not without precedent in Baltimore, in respect to port development. *Marchant v. Baltimore*, 146 Md. 513, 521.

Schemes for the attraction and financing of new industry

18

have been adopted in other states, and have generally been sustained by the courts. In *Faulconer v. City of Danville,* 232 S. W. 2d 80 (Ky.), a city was authorized to acquire a site and erect a factory thereon, to be leased to a private corporation under a long term lease. The legislation was sustained. In that case, the city did not pledge its credit, but the bonds were to be payable out of the rents. But in *Dyche v. City of London,* 288 S. W. 2d 648 (Ky.), a plan calling for the issuance of municipal bonds was sustained. A similar plan was sustained in Mississippi in *Albritton v. City of Winona, supra.* A similar plan involving revenue bonds was sustained in Tennessee. *Holly v. City of Elizabethton,* 241 S. W. 2d 1001 (Tenn.). See also *Halbert v. Helena-West Helena Indus. Develop. Corp.,* 291 S. W. 2d 802 (Ark.); *Opinion of the Justices,* 49 So. 2d 175 (Ala.); *Newberry v. City of Andalusia,* 57 So. 2d 629 (Ala.); *Village of Deming v. Hosdreg Co.,* 303 P. 2d 920 (N. M.). Cf. *Pipes v. Hilderbrand,* 243 P. 2d 123 (Cal. App.) (factory at airport).

On the other hand, in New Hampshire, a scheme to provide industrial parks and other facilities to attract industry was disapproved on the narrow ground that the legislation did not contain sufficient guides or standards. *In re Opinion of the Justices,* 114 A. 2d 514 (N. H.). In Florida, a scheme to finance an industrial enterprise through revenue bonds was disapproved in sweeping terms. *State v. Town of North Miami,* 59 So. 2d 779, 785, 784 (Fla.). The court said: "The financing of private enterprises by means of public funds is entirely foreign to a proper concept of our constitutional system. Experience has shown that such encroachments will lead inevitably to the ultimate destruction of the private enterprise system. * * * Every new business, manufacturing plant, or industrial plant which may be established in a municipality will be of some benefit to the municipality. A new super market, a new department store, a new meat market, a steel mill, a crate manufacturing plant, a pulp mill, or other establishments which could be named without end, may be of material benefit to the growth, progress, development and prosperity of a municipality. But these considerations do not make the acquisition of land and the erection of

buildings, for such purposes, a municipal purpose." This decision was followed in *State v. City of York,* 82 N. W. 2d 269 (Neb.). We cannot accept the reasoning of these cases. The Constitution does not guarantee a static condition of society, or write into our basic law the economic doctrine of laissez-faire. So long as the legislation has a substantial relation to the public welfare and can fairly be said to serve a public purpose, it is not the courts' function to strike it down, merely because we fear it may lead to unwise or unfortunate results. We think the legislation in the instant case is not beyond the bounds of legislative power.

> *Decree reversed, with costs, and case remanded for the passage of a decree in accordance with the views expressed in this opinion.*

PRESCOTT, J., filed the following dissenting opinion.

It is regrettable, when one member of the Court is unable to concur with the majority upon such an important and far reaching question as is here involved, that time will not permit a careful and comprehensive statement of the reasons why that member cannot yield his full concurrence. As sufficient time is not available, the following is freely acknowledged to be a hurriedly put together statement of some of those reasons.

The majority opinion holds that under the provisions of section 103 of Chapter 662 of the Acts of 1953, the City of Frostburg, if authorized by a referendum, may constitutionally issue bonds or certificates of indebtedness for the purpose of buying land and erecting thereon buildings to be used by *private* manufacturing companies for *private* profit. The statute recites no public distress or urgent public need, as do similar acts elsewhere, but states its simple purpose is, "in order to encourage industrial development." It likewise fails to state how the bonds or certificates are to be redeemed, but it is axiomatic that this must be done by taxation.

This Court, many years ago, held that taxes can not be im-

posed for a private purpose; that by Art. 15 of the Declaration of Rights and the fundamental maxims of free government taxes can only be imposed to raise money for *public* purposes; that counties (the same certainly also applies to municipalities) have no inherent power of taxation; what power of taxation they exercise must be delegated to them by the legislature; the legislature, however, cannot delegate a power prohibited by the constitution; therefore, the taxing power, when exercised by the counties, "is but the exercise of the taxing power of the Legislature delegated to them, and is *subject to every constitutional limitation* to which the taxing power of the Legislature is subject." (Emphasis supplied). *Balto. & E. S. R. Co. v. Spring,* 80 Md. 510, 517, 31 A. 208.

Art. III, sec. 34, of our Constitution, in part, reads as follows: "The credit of the State shall not in any manner be given, or loaned to, or in aid of any individual, association or corporation * * *." Art. III, sec. 54, and Art. XI, sec. 7, permit the counties and Baltimore City to do so under certain conditions, but there is no provision in the Constitution with reference to municipalities.

Thus, the questions are presented: (1), Will the taxes to raise the funds for the payment of the bonds be imposed for a public purpose?; and, (2), When the bonds are issued, will the credit of the State "in any manner be given, or loaned to, or in aid of any individual, association or corporation"?

The Supreme Court of the United States and several of our sister States have made rulings on these points; and as they express reasons that are, to me, persuasive, I shall quote at some length from them.

The recent case (1957) of *State v. York* (Neb.), 82 N. W. 2d 269, seems to be on all fours with the case at bar. The City of York entered into an agreement with the York Cold Storage Company and the York Packing Company, that upon the completion of certain industrial buildings to be constructed by the first named company, the City would purchase the same by issuing revenue bonds, pursuant to legislative authority; and upon the purchase of said industrial buildings, the City proposed to lease them to the York Packing Company as a packing plant. The constitutional provision in-

volved was practically identical with ours. It read: "The credit of the state shall never be given or loaned in aid of any individual, association, or corporation." The unanimous Court, with much of its cogent reasoning omitted, said:

> "It is here contended that the prohibition contained in the foregoing constitutional provision applies only to the State as an entity and has no application to political subdivisions thereof. We do not concur in this view. Political subdivisions of the State exist at the will of the State exercised through the Legislature. For us to say that the State may not loan its credit to an individual, association, or corporation, but that it might create a political subdivision and authorize it to do that which the State itself is prohibited from doing would be, to say the least, a very anomalous situation. It would permit the State to do by indirection the very thing it could not directly do, a theory which has been consistently condemned by this court.
>
> * * *
>
> "The defendants cite cases from other states upholding the constitutionality of similar acts. *Faulconer v. City of Danville,* 313 Ky. 468, 232 S. W. 2d 80; *Newberry v. City of Andalusia,* 257 Ala. 49, 57 So. 2d 629; *Holly v. City of Elizabethton,* 193 Tenn. 46, 241 S. W. 2d 1001 (cases cited and relied upon in our majority opinion). These cases are based on what we deem fundamental fallacies of reasoning. The first is that a revenue bond for which a city is not generally liable is not within the prohibition against the State giving or loaning its credit. The second is that the issuance of such revenue bonds for the construction of industrial plants for private users is a valid exercise of the proprietary powers of a municipality. The third is that the issuance of revenue bonds for the construction of industrial buildings for private use is for a public purpose.
>
> * * *

22

"We summarize as follows: The constitutional prohibition against the State as to giving or loaning its credit to an individual, association, or corporation is applicable to all subdivisions of the State.  * * * The money realized from revenue bonds is public money and it may not be appropriated for a private purpose or used for the purpose of acquiring property for the benefit of a private concern.  It is not material what such undertakings may be called, or what forms are devised to conceal their main purpose, or how worthwhile they may appear to be, when the question of constitutionality is presented, their substance will be examined.  The financing of private enterprises with public funds is foreign to the fundamental concepts of our constitutional system.  To permit such encroachments upon the prohibitions of the Constitution would bring about, as experience and history have demonstrated, the ultimate destruction of the private enterprise system. We have not overlooked the fact that the Legislature determined that the Act was for a public purpose. While such a legislative declaration is entitled to great weight, it is not conclusive.  There are limits beyond which the Legislature cannot go.  It cannot authorize a city to spend public money, or lend or give away, directly or indirectly, its credit or property for a purpose which is not a public one.

"The purpose of the statute, and the contract in the present case springing therefrom, is to assist a private corporation that is engaged in an enterprise for profit.  It is true, of course, that the city may be benefited by the location of the company in the city.  It may produce employment for citizens of the community.  It may tend to balance a locally restricted economy.  But general benefit to the economy of a community does not justify the use of public funds of the city unless it be for a public as distinguished from a private purpose.  This is simply a case where the city is attempting to use the powers,

credits, and public moneys of the city to purchase land and erect industrial buildings thereon for the use of a private corporation for private profit and private gain. It serves no public or municipal purpose. The Act purports to grant powers to cities which are beyond the authority of the Legislature to confer.

\* \* \*

"To permit legislation of this character to stand in the face of constitutional prohibitions would constitute a death blow to the private enterprise system and reduce the Constitution to a shambles in so far as its protection of private enterprise is concerned. The contract pleaded in the petition is void and the act upon which it is based is a plain violation of the letter and spirit of Article XIII, section 3, of the Constitution of this State."

For another case reaching the same result with equally persuasive reasoning, see *State v. Town of North Miami* (Fla.), 59 So. 2d 779. See also, *Carothers v. Town of Booneville* (Miss.), 153 So. 670; *Nash v. Town of Tarboro* (N. C.), 42 S. E. 2d 209; *Bybee v. City of Minneapolis* (Minn.), 292 N. W. 617; *Seeley v. Town of Belleair*, 127 F. 2d 840; *Village of Suring v. Suring State Bank* (Wis.), 207 N. W. 944.

Some years ago, there was a devastating fire in the City of Boston which destroyed an important part of that great city. The governor of the state convened the legislative body of Massachusetts, called the General Court, for the express purpose of dealing with the distressing situation. An act was passed which authorized the city to issue $20,000,000 worth of bonds. The proceeds of the bonds were to be loaned to the owners of the land, the buildings upon which had been burned, and the loans were to be secured by first mortgages, etc. The Supreme Judicial Court, unanimously, held the act unconstitutional, and during the course of their opinion stated:

"The power to levy taxes is founded on the right, duty and responsibility to maintain and administer

all the governmental functions of the State, and to provide for the public welfare. To justify any exercise of the power requires that the expenditure which it is intended to meet shall be for some public service, or some object which concerns the public welfare. The promotion of the interests of individuals, either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is, in its essential character, a private and not a public object. However certain and great the resulting good to the general public, it does not, by reason of its comparative importance, cease to be incidental. The incidental advantage to the public, or to the State, which results from the promotion of private interests, and the prosperity of private enterprises or business, does not justify their aid by the use of public money raised by taxation, or for which taxation may become necessary. It is the essential character of the direct object of the expenditure which must determine its validity, as justifying a tax, and not the magnitude of the interests to be affected, nor the degree to which the general advantage of the community, and thus the public welfare, may be ultimately benefited by their promotion." *Lowell v. Boston,* 111 Mass. 454.

The Supreme Court of the United States has also had occasion to pass upon the question. The legislature of Kansas attempted to authorize municipalities to issue bonds to aid and encourage the building of bridges, etc. The City of Topeka issued its bonds to aid and encourage a certain company in establishing bridge shops within the city. The Court held the act unconstitutional upon the ground that the taxes required for the redemption of the bonds would not be imposed for a *public* purpose. During the course of its opinion, the Court stated:

"To lay with one hand the power of the government on the property of the citizen, and with the other to bestow it upon favored individuals to aid

private enterprises and build up private fortunes, is none the less a robbery because it is done under the forms of law and is called taxation. This is not legislation. It is a decree under legislative forms.

\* \* \*

"It is undoubtedly the duty of the legislature which imposes or authorizes municipalities to impose a tax to see that it is not to be used for purposes of private interest instead of a public use, and the courts can only be justified in interposing when a violation of this principle is clear and the reason for interference cogent. And in deciding whether, in the given case, the object for which the taxes are assessed falls upon the one side or the other of this line, they must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether State or municipal. Whatever lawfully pertains to this and is sanctioned by time and the acquiescence of the people may well be held to belong to the public use, and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation.

"But in the case before us, *in which the towns are authorized to contribute aid by way of taxation to any class of manufacturers, there is no difficulty in holding that this is not such a public purpose as we have been considering.* If it be said that a benefit results to the local public of a town by establishing manufactures, the same may be said of any other business or pursuit which employs capital or labor. The merchant, the mechanic, the innkeeper, the banker, the builder, the steamboat owner are equally promoters of the public good, and equally deserving the aid of the citizens by forced contributions. No line can be drawn in favor of the manufacturer which

26

would not open the coffers of the public treasury to the importunities of two-thirds of the business men of the city or town." (Emphasis supplied.) *Loan Association v. Topeka,* 87 U. S. 655.

See also *Jarrolt v. City of Moberly,* 103 U. S. 580. The Supreme Court has adopted a policy of attempting to permit the highest Courts of the States to determine what is, and what is not, a public purpose. It may be assumed they would disagree in case of a flagrant misinterpretation.

Art. III, sec. 34, above, first placed in our Constitution in 1851, was not original with the framers of that Constitution. It is practically, if not, identical with a provision of the New York Constitution; this provision being added in 1846. Its purpose, as stated by Judge Cardoza, was "to put an end to the use of the credit of the state in *fostering the growth of private enterprise and business."* (Emphasis supplied.) (Should not this statement alone make us re-examine the statute we are presently considering?). The Court of Appeals of New York, in the case of *People v. Westchester County Nat. Bank,* 132 N. E. 241, held that a soldiers' and sailors' bonus bill was in violation of that State's constitutional provision (the one that is the same as ours), although the taxes that would be required to redeem the bonds would be imposed for a public purpose; that no matter how worthy the cause, or how useful the objects designed by the legislature, the bonus bill proposed to give the credit of the state to the veterans, which was prohibited by the above named section of the constitution. See also *Veterans' Welfare Board v. Jordan* (Cal.), 208 P. 284.

I shall not attempt to analyse all of the Maryland decisions that relate to the points being considered. There is no previous Maryland case that controls the decision here. The majority decision is new law in Maryland. This Court has held, rightfully in my opinion, that the legislature may authorize expenditures for public highways, education, hospitals, wharves, etc., where public services were rendered, and there was no *private profit.* I have found, and been referred to, no Maryland case, before the majority opinion herein, where

public funds were used to establish private enterprise for private profit. The port development project in Baltimore anticipated, as incidental to its over-all object of opening the harbor of Baltimore to the markets of the world, leasing at least some of the wharves to private concerns. *Marchant v. Baltimore,* 146 Md. 513, 126 A. 884.

In *Finan v. M. & C. C. of Cumberland,* 154 Md. 563, 141 A. 269, this Court sanctioned, as a public purpose, the expenditure of public funds for the purposes of a hospital conducted by the Allegany Hospital of Sisters of Charity, although a private eleemosynary corporation. It will be noted that this was an eleemosynary institution and no private profit was involved. It would seem that this liberal construction of section 34 and of what is a public purpose should certainly be the borderline; to go further, as permitted by the majority opinion, will be, in my opinion, the utilization of taxation for private purposes, and will contravene the explicit inhibition of section 34 that, "the credit of the State shall not *in any manner* be given, or loaned to, or in aid of any individual, association or corporation." (Emphasis supplied.)

Before concluding, let us consider one simple illustration. Suppose A owns a parcel of land in Frostburg and desires to erect thereon a manufactory to make shoes. B is interested in conducting a shirt manufactory, and the desirable location therefor is A's parcel of ground. Are there many persons who would consider that B's undertaking is such a "public purpose" as would entitle the City of Frostburg to condemn A's property in order to erect an establishment for B, paying both for the property and the erection of the building from the proceeds of the bonds issued in pursuance of the act being considered?[1] I think not; yet the majority opinion holds that the bonds to be issued are for a "public purpose".

With due deference to, and respect for, my colleagues, I think the act is unconstitutional and void; that, as stated by

---

1. 1 *Cooley Taxation* (4th Ed.) sec. 176, says: "For the most part the term 'public purposes' is employed in the same sense in the law of taxation and in the law of eminent domain." And the charter of Frostburg grants it the right of eminent domain.

28

the Nebraska, Florida and other Courts, the ruling will strike a terrific blow to private enterprise, a system under which this country has thrived and prospered; and with the government of Maryland and all of its municipalities in business, it is difficult to visualize the boundaries to which the principle may extend.