SALISBURY LAND AND IMPROVEMENT COMPANY
*vs.* COMMONWEALTH.

Essex.   March 25, 1913. — June 19, 1913.

Present: RUGG, C. J., MORTON, LORING, SHELDON, & DE COURCY, JJ.

*Constitutional Law,* Eminent domain, Police power.   *Salisbury Beach
Reservation.*

St. 1912, c. 715, purporting by § 4 to authorize the Salisbury Beach Reservation
Commission to take by right of eminent domain as a public reservation any or
all of the land or of the rights in any land in a described portion of the town
of Salisbury bounding on the Atlantic Ocean and the Merrimac River, which
included when the act was passed an existing seaside resort equipped with cot-
tages and other appurtenances, and providing in § 10 that "Said commission
may sell or lease any lands or rights in land taken or acquired by it, which are
not needed as a public reservation," with other provisions contemplating the
taking, not only of the seashore and other lands purely for reservation purposes,
but also other real estate in the designated territory to be sold or leased to
private persons, is unconstitutional as an attempt to authorize the exercise
of the right of eminent domain in part for a private purpose, and because
it is impossible to separate the valid from the invalid portions of the
statute.
The interest of the public that the people should be well housed, although proper
to be considered in the exercise of the police power, is not a proper subject
for the exercise of the right of eminent domain.   By RUGG, C. J.

PETITION, filed in the Land Court on January 12, 1911, by the
Salisbury Land and Improvement Company, and amended by
leave of court on July 13, 1912, by the substitution as petitioners
of the trustees of the Salisbury Beach Associates and other per-
sons who after the filing of the petition had acquired the title of the
original petitioner, for the registration of title to certain land at
Salisbury Beach in Salisbury notwithstanding an attempted tak-
ing of such land by the Salisbury Beach Reservation Commission
under St. 1912, c. 715, which was alleged by the substituted pe-
titioners to be unconstitutional.

The case was heard by *Davis,* J., who found the facts which are
stated in the opinion, and ruled *pro forma* that the statute in
question was constitutional and the taking valid.   He ordered
that a decree be entered dismissing the petition for registration

of title as to all land covered by such alleged taking, and at the request of the parties reported the case for determination by this court. If the order of the judge was right, the decree was to be entered as ordered; otherwise, the case was to be remanded to the Land Court for such further proceedings as this court might direct.

*H. I. Bartlett,* (*W. Coulson* with him,) for the Salisbury Beach Associates.

*J. M. Swift,* Attorney General, & *E. S. Abbott,* for the Commonwealth, submitted a brief.

RUGG, C. J. The question presented is the constitutionality of St. 1912, c. 715, entitled "An Act to make Salisbury Beach a public reservation and to establish the Salisbury Beach Reservation Commission." Its several sections provide for the appointment of a commission and the machinery by which land may be taken, money raised and a public reservation managed. The ground of attack upon its validity is that it authorizes the taking of land for a private rather than a public use. In order to pass intelligently upon its constitutionality in this respect the physical facts to which it is applicable may be considered to ascertain what may be its practical operation. The property which may be taken under the statute is known as Salisbury Beach and consists of sand dunes and beach in the town of Salisbury extending from the New Hampshire line about three and one half miles by the sea to the mouth of the Merrimac River. A street railway has been constructed along the length of the beach. On the ocean side there are cottages for summer occupancy and on the westerly line of the dunes a large number of houses have been built, and hotels, shops, boarding houses, places of amusement and other buildings have been constructed and a summer community has been established, with a system of water and gas pipes, electric lights, sewers and telephones, all of which, including the street railway, were leased by the petitioner or its predecessors in title. Streets were laid out or provided for by agreement with the town, plans were drawn showing the property divided into house lots and many lots were leased to cottage owners and others. The property was owned by the Commoners of Salisbury until 1903, when it passed into private ownership, and finally has come to the petitioner. Since the acquirement of the property by the petitioner many leases have expired and they

have not generally been renewed except in a few instances and at a substantial increase in rent.

The material portions of the act are printed in a footnote.*

It is a familiar principle of constitutional law that every presumption is made in favor of the validity of a statute. It is not to be held a violation of the fundamental charter established by the people in their constitution unless so clearly outside the power conferred upon the Legislature as to be free from reasonable doubt in that regard. It must be assumed that the Legislature intended to act within its lawful bounds and this assumption cannot be overthrown unless the statute unmistakably oversteps these bounds by manifest and plain terms. On the other hand when it is clear that the statute transgresses the authority vested in the Legislature by the Constitution, it is the duty of the court, a duty from which they cannot shrink without profaning their oaths of office, to see and to declare the invalidity of the statute. The judicial department of government cannot surrender its judgment respecting the validity of statutes to that of either of the other departments and when the occasion arises must refuse to enforce a statute which does not conform to the requirements of the fundamental law of the land. The statute must be

---

* Section 4 authorizes the commission "to acquire in fee, by purchase, gift or by right of eminent domain, in the name of the Commonwealth, and thereafter to maintain and make available for the inhabitants of the Commonwealth as a public reservation for the use, exercise and recreation of the inhabitants of the Commonwealth, any or all of the land or any or all of the rights in any land in" a specific portion of the town of Salisbury bounding on the Atlantic Ocean and Merrimac River.

"Section 10. Said commission may sell or lease any lands or rights in land taken or acquired by it, which are not needed as a public reservation for the use, exercise and recreation of the inhabitants of the Commonwealth, with or without restrictions as to its use as it may deem advisable, and may make sales of the grass, sand, and other materials in said reservation. The town of Salisbury shall levy, assess, and collect a tax on all buildings and personal estate in said reservation not owned by the Commonwealth in the same manner as if the said reservation had not been created, and shall collect a tax on all land in said reservation not taken, acquired or used by said commission for the purposes of this act.

"Section 11. The town of Salisbury shall have the general charge and supervision of the education of the children resident in the reservation as in the case of other children resident in the said town."

construed as a whole. That which, by fair intendment, its terms may confer power to accomplish, must be ascertained by a broad consideration of the entire act, bearing constantly in mind the presumption in favor of its validity.

The establishment and maintenance of public parks and reservations out of moneys raised by taxation and the exercise of the power of eminent domain for their acquirement plainly are within the power of the Legislature. It requires no discussion to demonstrate that this is a public purpose. Nor can it be contended reasonably in view of many of our decisions that the taking of the fee rather than an easement in land to this end is not permissible. *Higginson* v. *Treasurer & School House Commissioners of Boston,* 212 Mass. 583 and cases cited at 591. The acquirement of beaches by eminent domain and at the public expense for bathing and other purposes of general utility has never been questioned in this Commonwealth. That it is a legitimate exercise of the sovereign power is not open to doubt. See *In re Metropolitan Park Commissioners, petitioners,* 209 Mass. 381. Looking alone at § 4 of the act now under consideration, the power conferred does not appear to go beyond the right of acquiring and maintaining land and rights in land for a public park or reservation. But this section must be read in connection with other sections in order to understand the full scope of the act. Section 10 authorizes the commission to "sell or lease any lands or rights in land taken . . . by it, which are not needed as a public reservation." These words are not restricted as to time. They form a part of the original act and are operative contemporaneously with all its other provisions. There is nothing to require a determination that by reason of changed conditions land deemed necessary at the time of taking, has become no longer needed. These words in connection with § 4 undertake to enable the commission to take "any or all of the land" within the designated area and at the same moment to determine that some of the lands thus taken "are not needed" and immediately to proceed to "sell or lease" such lands. Thus there may be an adjudication that lands are needed for the public use which involves a payment for them out of moneys raised by taxation, coupled with a determination not to devote some of these lands to the enjoyment of the people at large but to sell or lease them for private occupation.

There are no words in this or the other sections which limit this broad power. It is not stated expressly or by implication that such sales or leases can be only of property once needed and used for the public resort but which through changed conditions have become useless therefor, nor confining the right to trifling and almost negligible remnants of estates which would be unsuitable for private use after the part actually needed for public use has been appropriated. That this wide power of taking for private use was intended by the present act is confirmed by reference to the latter part of §10. to the effect that the town of Salisbury may tax "all buildings and personal estate in said reservation not owned by the Commonwealth . . . and shall collect a tax on all land in said reservation not taken, acquired or used by said commission for the purposes of this act." The first part of this sentence seems to contemplate that buildings and personal property shall be and remain in private ownership upon the reservation to such an extent as to be substantial subjects of taxation, while the final clause appears to provide for the taking and holding by the commission of substantial areas of land not for the public purposes set forth in the act. No land can be "in said reservation" until taken or acquired by the commission under the authority of the act. The evident design of § 11 is that upon the reservation shall be such a considerable settlement of inhabitants that special provision was thought to be needed for the education of the children in the public schools of Salisbury. This would be impossible if a reservation of this size were devoted wholly to the public. Whatever may be said of the force of any one of these several provisions standing alone, taken in conjunction and construed together they authorize the taking not only of the seashore and other lands purely for reservation purposes but also of other tracts in the designated territory to be sold or leased to private individuals, or held without appropriation to the use of the public, which means inferentially a holding for private uses. When applied to the subject matter, namely, an existing summer resort with all its equipment of cottages and other appurtenances, it is difficult to say which of these two is the dominant aim.

The construction put by the commission upon the powers conferred by the act as revealed by their conduct is in accordance with this interpretation. It merely indicates the natural meaning of the

act. The taking,* which is made a part of the record, shows generally a careful exclusion of most of the lots not owned by the petitioner, even though in numerous instances this results in an interruption of the shore line and in many others leaves small lots owned by individuals surrounded by land taken. The impression created by looking at the plan of the taking was not inaccurately described in argument as a "checker board" effect. It was found by the Land Court that the commission interpreted the act to authorize them legally to "take such lands as they did take for the purpose of carrying out the intent of the law, which, for the protection of the present cottage owners and people who in the future may become cottage owners or occupants, was to be done by leasing or selling the lands taken." This statement aptly summarizes the effect of the act. It authorizes the taking of land a part of which may never be intended for any public purpose, but for lease or sale for private use. It would be possible for the commissioners, although strictly following the terms of the statute, to take this entire summer colony with its numerous houses and other buildings and substitute themselves for the petitioner as landlord, and lease all the cottages and buildings indefinitely, or ultimately to sell them. The statute would enable the establishment of what in essence would be a scheme for utilizing and developing a seashore summer resort for the benefit of cottagers on a scale of some magnitude. This being the meaning of the statute, it remains to inquire whether it is within the scope of legislative power.

The acquisition of land under the power of eminent domain to be devoted to private uses has been recently considered and discussed somewhat at length. It has been said that the exercise of the power of the State, either through taxation or eminent domain, to take land from one person with the intent of handing it over to another person, is not a public purpose and is contrary to basic and essential principles of free government. *Opinion of the Justices,* 204 Mass. 607. The underlying objection is that the main end of legislation for this purpose is a private utility

---

* In the decision of the judge of the Land Court it was stated that "This taking was filed by said Salisbury Beach Reservation Commission under the advice of counsel specially employed by said commission and without the knowledge of the Attorney General."

rather than the general good. While incidentally it may be an advantage to the public that private persons prosper, if the essential character of the transaction in its direct object is private benefit to individuals, the purpose is not public. In a general sense it is of public interest that the people be well housed, but this does not authorize the State to become the general landlord. That subject is a proper one for the exercise of the police power but not of eminent domain. It was said by the Supreme Court of the United States, speaking through Mr. Justice Harlan in *Madisonville Traction Co.* v. *St. Bernard Mining Co.* 196 U. S. 239, 251: "It is fundamental in American jurisprudence that private property cannot be taken by the government, national or state, except for purposes which are of a public character, although such taking be accompanied by compensation to the owner. That principle . . . grows out of the essential nature of all free governments." Private property cannot be taken directly or indirectly for a private end. It cannot be seized ostensibly for a public use and then diverted to a private use. Legislation which is designed or which is so framed that it may be utilized to accomplish the ultimate result of placing property in the hands of one individual for private enjoyment after it has been taken from another individual avowedly for a public purpose is unconstitutional. It would enable that to be achieved by indirection which by plain statement would be impossible. These principles have been expounded at length in early decisions and recent opinions of this court with affluent citation of authorities. It is not necessary to do more than refer to a few of them. The case at bar is indistinguishable from them. *Lowell* v. *Boston,* 111 Mass. 454. *Wilkins* v. *Jewett,* 139 Mass. 29. *Mead* v. *Acton,* 139 Mass. 341. *Opinion of the Justices,* 204 Mass. 607. *Opinion of the Justices,* 204 Mass. 616. *Opinion of the Justices,* 211 Mass. 624. See also *Hairston* v. *Danville & Western Railway,* 208 U. S. 598; *Sanborn* v. *Van Duyne,* 90 Minn. 215; *Brown* v. *Gerald,* 100 Maine, 351.

The statute in the case at bar differs materially from others where the right to sell portions of real estate taken by eminent domain has been conferred. The metropolitan water act (St. 1895, c. 488, § 11) authorizes the sale of land "no longer needed for the water works" and the lease of "property not then so needed." Property acquired for the metropolitan sewerage sys-

tem "no longer needed" therefor may be sold (St. 1892, c. 25., § 1), while the metropolitan park commission "for all purposes not inconsistent with the purposes specified in the act establish- ing said commission" are given certain modified rights of granting interests in lands. Statutes like these where the right to sell or lease manifestly is purely incidental to the chief public end and is confined by fair intendment to land or buildings either once ac- tually needed and used, which have ceased so to be needed, or which by lease may promote the general public aim, afford no support to the broad powers here attempted to be created. See *Boston* v. *Boston Elevated Railway, ante,* 41. The same is true of the right to develop and sell power as incidental to a public undertaking. St. 1895, c. 488, § 3. *United States* v. *Chandler- Dunbar Water Power Co.* 229 U. S. 53, 72, 73. An absolute and unqualified power to sell and lease such as the present statute confers is different in kind from the carefully guarded powers conferred by the statutes to which we have referred. Moreover, a right to sell, when no longer needed, property taken or used for a public enterprise, requiring extensive works of con- struction where during the period of excavation or building land might be needed which would have no use on the comple- tion of the work, is quite distinguishable from land taken for park or reservation purposes.

The taking here is not of a vast extent of wild or unsurveyed land whose agricultural and other possibilities are undiscovered. It is in one of the oldest towns of the State, is relatively small in area, and is a settled community with a large number of cottages and all its characteristics thoroughly capable of easy comprehen- sion. It requires no discussion to distinguish the power con- ferred by the present statute from that given to the metropoli- tan park commission and other like officers to construct or lease buildings manifestly in furtherance of the convenient use by the people of the parks and reservation. A shelter or a restaurant or a bath house, to which all have access on equal terms, do not stand on the same basis as a resort to a considerable extent devoted to cottages to be leased to private families, and from which when leased or sold the public must be excluded.

The cases relied upon by the Commonwealth plainly are dis- tinguishable. In *Boston* v. *Talbot,* 206 Mass. 82, the dominant

purpose of the act under consideration was the construction of the tunnel in Boston. Its terms did not permit a taking of land with a contemporaneous knowledge and purpose that a definite and separable part was not necessary for the public use. The authority to sell land taken was conferred only when in the judgment of the transit commission it shall "cease to be needed," plainly implying an adjudication that once it had been needed, but by reason of changed conditions was no longer required. The real estate there in question consisted in large part of horizontal planes of a building, a substantial part of one floor of which was used permanently for the tunnel, and considerations of economy in taking an entire estate were weighty in sustaining the statute. The reasoning of that opinion shows a wide divergence from the arguments urged on behalf of the Commonwealth and a reliance upon quite different facts. The only one there relied on which seems to us to have any connection with the case at bar is that it may be cheaper to take the entire estate of the petitioner with the power to sell or lease a part of it than to take the part intended to be used for a reservation. The dominant purpose of this act affords no justification for the application of that principle. Here no excavations or constructions are contemplated which warrant the inference that any property would be injured in such a way as to cause real apprehensions of future danger which might prove groundless in actual experience or embarrassment in the assessment of damages. Any taking of a part of the property of the petitioner apparently would present the ordinary questions of assessment of the damage which are of common occurrence. *Moore* v. *Sanford*, 151 Mass. 285, upheld the constitutionality of a statute which authorized the taking and filling of flats adjacent to flats of the Commonwealth and the subsequent sale of the filled land. But this was on the express ground that it was for the improvement of Boston Harbor to which was annexed the reclamation of property of little or no worth without such improvement. The principle of development of lands substantially useless under private control compared with their potential value as part of a general scheme of public improvement through the regulation of the common interests of owners always has been relied on with caution although it was held to be constitutional in our early case of *Talbot* v. *Hudson*, 16 Gray, 417, and has been applied in

supporting the numerous statutes establishing irrigation districts. *Fallbrook Irrigation District* v. *Bradley,* 164 U. S. 112. *Clark* v. *Nash,* 198 U. S. 361. *Strickley* v. *Highland Boy Gold Mining Co.* 200 U. S. 527. See *Otis Co.* v. *Ludlow Manuf. Co.* 186 Mass. 89; *S. C.* 201 U. S. 140; *Turner* v. *Nye,* 154 Mass. 579, 582; *Wurts* v. *Hoagland,* 114 U. S. 606. But this principle has no relation to the case at bar. *Hellen* v. *Medford,* 188 Mass. 42, affords no support to the contention of the Commonwealth. The statute there under consideration was held to be unconstitutional, but the plaintiff was not in a position to take advantage of it, a principle frequently applied but having no bearing upon the issues here raised, where the petitioner from the beginning has assailed this statute and has done nothing to waive its rights.

It is impossible to separate the valid from the invalid parts of this statute. The power of the commission to take land is inextricably interwoven with the power to sell and lease land so taken. It cannot be determined how the Legislature would have dealt with the subject matter if their attention had been directed specifically to the point that land and buildings, including a large number of dwelling houses, could not be taken for the purpose of lease and sale under the changed conditions of being in the neighborhood of a public reservation and the expense of the undertaking lessened by the revenue to be derived therefrom. Different financial and other questions would have been presented, which might have caused the General Court to have refrained from action or to have enacted a statute of other tenor. *Edwards* v. *Bruorton,* 184 Mass. 529. *Commonwealth* v. *Hana,* 195 Mass. 262, 267.

We feel constrained to pronounce the statute unconstitutional. It becomes unnecessary to pass upon the other questions raised by the report.

*Case remanded to the Land Court for further proceedings in accordance with this opinion.*