ALLYDONN REALTY CORPORATION & others *vs.* HOLYOKE HOUSING AUTHORITY & another.

Hampden.   September 21, 1939. — November 21, 1939.

Present: FIELD, C.J., DONAHUE, QUA, DOLAN, & COX, JJ.

*Housing Authority Law.   Constitutional Law,* Police power, Housing, What is public purpose.

The housing authority law, G. L. (Ter. Ed.) c. 121, §§ 26I–26II, as inserted by St. 1938, c. 484, § 1, is constitutional.
Statement by QUA, J., as to the determination of what is a public purpose within the meaning of constitutional law.

PETITION, filed in the Superior Court on February 15, 1939, against Holyoke Housing Authority and the city of Holyoke.

The Attorney General was allowed to appear for the Commonwealth.

The case was heard by *O'Connell*, J., upon an agreed statement of facts, and was reported for determination by this court.

*J. B. Ely,* (*T. C. Maher & F. M. Kingsbury* with him,) for the petitioners.

*J. R. Nolen,* (*J. I. Robinson* with him,) for Holyoke Housing Authority.

*E. O. Proctor,* Assistant Attorney General, for the Commonwealth.

QUA, J.   The primary object of this petition by Allydonn-Realty Corporation and ten individual taxable inhabitants of Holyoke is to restrain the respondent city of Holyoke from expending money under a "coöperative agreement" which the city has entered into with Holyoke Housing Authority in connection with the proposed construction by the latter of a low-rent housing project in the respondent city.   Jurisdiction rests upon G. L. (Ter. Ed.) c. 40, § 53. It is unnecessary in this instance to determine whether the corporate petitioner was properly joined with the ten individuals.   The Attorney General was allowed to appear for the Commonwealth under G. L. (Ter. Ed.) c. 12, § 3.

The only question argued, upon which alone a decision is sought, is whether the Housing Authority Law, G. L. (Ter. Ed.) c. 121, §§ 26I to 26II, inclusive, as inserted by St. 1938, c. 484, § 1, is constitutional.   The answer in essence depends upon whether under that law public moneys and the power of taxation are to be utilized for purposes that are in their nature public, or for the private advantage of particular persons.

The act is entitled, "An Act to Relate the Massachusetts Housing Authority Law to the United States Housing Act of Nineteen Hundred and Thirty-seven."   See U. S. C., 1934 ed., Sup. IV, Title 42, §§ 1401 *et seq.*   Its provisions may be briefly reviewed.   "Low-rent housing" is defined as "decent, safe and sanitary dwellings within the financial reach of families of low income, and developed and administered to promote serviceability, efficiency, economy and stability . . . ."   "Families of low income" are "families who are in the lowest income group and who cannot afford to pay enough to cause private enterprise in their locality or in the same metropolitan area to build an adequate supply of decent, safe and sanitary dwellings for their use."

A "Sub-standard area" is "any area wherein dwellings predominate which, by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitation facilities, or any combination of these factors, are detrimental to safety, health or morals." A "project" may consist in the removal of buildings from a substandard area, or in providing decent, safe and sanitary dwellings for families of low income, or in a combination of the two. § 26J. It is declared that substandard areas exist in "certain portions" of the Commonwealth; that there is not an adequate supply of low-rent housing for families of low income within a reasonable distance of the principal centers of employment; that "this situation tends to cause an increase and spread of disease and crime and constitutes a menace to the health, safety, morals, welfare and comfort of the inhabitants of the commonwealth and is detrimental to property values therein"; and that "this situation cannot readily be remedied by the ordinary operations of private enterprise." § 26K. Provision follows for the creation in cities and towns of housing authorities as public bodies politic and corporate, which, however, are to exercise no powers until the city council of a city, with the approval of the mayor, determines that a housing authority is needed therein for the clearance of substandard areas or the provision of low-rent housing for families of low income, or until a town votes for the organization of such an authority for such purpose. In determining the need for the clearance of substandard areas or for low-rent housing the city council or the town is to take into consideration "the need for relieving congestion of population, the existence of insanitary or unsafe inhabited dwellings, and the shortage of safe or sanitary dwellings available for families of low income at rentals which they can afford." § 26L. A housing authority, with the approval of the State board of housing and of the mayor of a city or the selectmen of a town, may enter into agreements with the Federal government, including the United States Housing Authority, relative to the acceptance or borrowing of funds for projects and, with like approval, may contract with the Federal government for pur-

chasing or leasing a clearance or low-rent housing project. § 26Q. Housing authorities are granted the incidental powers necessary to carry out their projects, including the power to determine what areas are "sub-standard," the power of eminent domain, the power to make contracts for construction, reconstruction, alteration or repair of clearance or low-rent housing projects, to act as agent of, or to coöperate with, the Federal government in said projects, to lease and operate such projects, to borrow money upon its bonds and notes secured by mortgage on its property or pledge of its revenue, and to make by-laws and regulations to carry its powers into effect. § 26R. Projects are subject to the approval of the State housing board as to health, sanitation, safety, and financing. § 26S. Cities and towns may appropriate sums limited in proportion to their valuations in aid of housing authorities for various purposes in connection with projects, including sums necessary for defraying such part of the development, acquisition and operating costs as will not be met by loans or grants of the Federal government or otherwise. §§ 26U, 26V. Real estate and tangible personal property of a housing authority held in connection with a project financed by the Federal government are exempt from taxation, but the authority may be required to pay to the city annually a charge for municipal services supplied to the project. § 26W. Projects, after completion, are to be maintained and operated by the housing authorities. It is declared to be the policy of the Commonwealth that rents be fixed at the lowest possible rates consistent with providing decent, safe and sanitary dwelling accommodations, and that no project shall be operated for profit or as a source of revenue to the Commonwealth or to the city or town. Rentals shall be within the financial reach of laborers and wage earners of low income. Accommodations rented or leased to a tenant shall consist of the least number of rooms deemed necessary to provide safe and sanitary accommodations to the proposed occupants without overcrowding. Families are not to be accepted as tenants whose annual income exceeds five (in some cases six) times the annual rental. There is a provi-

sion against discrimination among applicants.   § 26AA.
No project involving the construction of new dwellings shall
be undertaken "unless the project includes the elimination
by demolition, condemnation and effective closing of unsafe
or unsanitary buildings situated in the same city or town
containing dwelling units substantially equal in number to
the number of newly constructed dwelling units provided
by the project."   § 26CC.   Obligations of a housing author-
ity are not to bind the Commonwealth or the municipality.
§ 26GG.

The distinction between a use or service which is public
and therefore a proper object of governmental expenditure
and one which is private and therefore an improper object
to which to devote money belonging to all of the people
has been discussed at length in its application to various
situations in a number of instances coming before this court.
*Lowell* v. *Boston*, 111 Mass. 454.   *Mead* v. *Acton*, 139 Mass.
341.   *Opinion of the Justices*, 150 Mass. 592.   *Moore* v. *San-
ford*, 151 Mass. 285, 288, 289, 290.   *Kingman* v. *Brockton*,
153 Mass. 255.   *Opinion of the Justices*, 155 Mass. 598.
*Opinion of the Justices*, 175 Mass. 599.   *Opinion of the
Justices*, 182 Mass. 605.   *Opinion of the Justices*, 186 Mass.
603.   *Opinion of the Justices*, 190 Mass. 611, 613.   *Opinion
of the Justices*, 204 Mass. 607.   *Opinion of the Justices*, 211
Mass. 624.   *Salisbury Land & Improvement Co.* v. *Common-
wealth*, 215 Mass. 371.   *Opinion of the Justices*, 297 Mass.
567, 571.   Some of these cases have become generally recog-
nized as leading cases.   They do not, however, establish
any universal test.   Each case must be decided with refer-
ence to the object sought to be accomplished and to the
degree and manner in which that object affects the public
welfare.   Frequently an object presents a double aspect in
that it may in some respects result in conferring a benefit
upon the public and in other respects it may result in con-
ferring a benefit upon or in paying money to private in-
dividuals.   In such instances the cases tend to distinguish
between those results which are primary and those which
are secondary or incidental and to classify the object accord-
ing to its primary consequences and effects.   At any rate it

is plain that an expenditure is not necessarily barred because individuals as such may profit, nor is it necessarily valid because of incidental benefit to the public. See *Horrigan* v. *Mayor of Pittsfield,* 298 Mass. 492, 497, and cases cited.

Some of the factors which the cases suggest as proper to be considered are these: Whether the benefit is available on equal terms to the entire public in the locality affected; whether the service or commodity supplied is one needed by all or by a large number of the public; whether the enterprise bears directly and immediately, or only remotely and circumstantially, upon the public welfare; whether the need to be met in its nature requires united effort under unified control, or can be served as well by separate individual competition; whether private enterprise has in the past failed or succeeded in supplying the want or in eradicating the evil; whether, in so far as benefits accrue to individuals, the whole of society has an interest in having those individuals benefited; whether a proposed extension of governmental activity is in line with the historical development of the Commonwealth and with the general purpose of its founders; whether it will be necessary to use public ways or to invoke the power of eminent domain; whether a special emergency exists, such as may be brought about by war or public calamity. It is hardly necessary to say that the foregoing considerations are in no sense to be regarded as exclusive of others, and that great weight or little or no weight may be attached to some of them according to the presence or absence of others, or of still other conditions not hereinbefore enumerated.

The Housing Authority Law presents two facets. One type of "project" is the clearance of substandard areas, in other words, the abolition of slums. The other is the provision of low-rent housing. We shall examine these in turn. The statute contains legislative findings in substance that slums exist in this Commonwealth, and that they tend to increase crime and to menace the health and comfort of the inhabitants. These findings are entitled to weight in this court. *Howes Brothers Co.* v. *Unemployment Compen-*

*sation Commission,* 296 Mass. 275, 283.  In any event we should be blind to the obvious, if we did not know that they are true.  That they apply to this particular project in Holyoke has in effect been found by those charged by the statute with the duty of initiating and approving projects, and there is no evidence that their findings are unreasonable or unwarranted.  Whatever good may have been accomplished by means of existing regulatory laws and ordinances enacted in pursuance of the police power, neither those means nor the operation of private enterprise has thus far abolished the evil.  If the Legislature now believes that an entirely different method of attack is demanded we cannot say that that belief is unfounded in reason.  We cannot say that expenditures directed in a rational manner toward the elimination of slums are not expenditures for a public purpose.  It is unnecessary to dilate at length upon the pernicious influence of slums, upon the manner in which that influence may be found to reach out and to affect an entire community, lowering moral standards, and increasing the cost to all of police, fire and health protection.  The analogy between a slum and a public nuisance cannot be overlooked.  Although the injurious effects of the former are less obvious and more insidious than those of the latter, they are likely to penetrate more deeply and to spread more widely.  The abatement of a public nuisance may well be a public purpose.  *Talbot* v. *Hudson,* 16 Gray, 417, as explained in *Lowell* v. *Boston,* 111 Mass. 454, 470–471.  *Dingley* v. *Boston,* 100 Mass. 544.  The elimination of slums can be found to be a direct benefit and advantage to all of the people, to be a matter not readily approached through private initiative but demanding coördinated effort by a single authority, to be in line with the purposes of promoting the public safety, health and welfare for which the government of the Commonwealth was established, and to require for its successful accomplishment the exercise of the power of eminent domain.  It may well be deemed to rise to the dignity of a public service.

We next turn our attention to the second function of the

statute, the provision of low-rent housing. If the construction and maintenance of low-rent housing for families of low income (not paupers) were the sole object of the statute we might have difficulty, in view of former decisions and opinions of this court hereinafter discussed, in holding that object to be public in character. But this part of the statute does not stand alone. The two parts were intended to complement each other. Probably it was expected that most projects would embrace both the clearance of slums and the provision of sufficient low-rent housing to prevent hardship to those whose homes would be razed and to give permanent assurance that such persons would not crowd into other substandard areas or create new slums. Even if there may be projects for low-rent housing which do not involve the clearance of a substandard area, nevertheless § 26CC provides for the elimination in each instance of unsafe or unsanitary buildings containing dwelling units substantially equal in number to the newly constructed dwelling units provided by the project, so that new construction is always to be accompanied by the elimination, either in slum areas or in dangerous or unsanitary buildings, of a number of dwelling units substantially equal to the number of those constructed. The requirement that the rents be within the financial reach of families "who are in the lowest income group and who cannot afford to pay enough to cause private enterprise . . . to build an adequate supply of decent, safe and sanitary dwellings for their use" (§ 26J) is doubtless intended as an additional guaranty that the provision of low-rent housing will result in the permanent elimination of the slums and unsafe and unsanitary buildings which are to be closed or demolished without incurring the risk of others equally bad being substituted for those removed. The real purpose of the statute is therefore the elimination of slums and unsafe and unsanitary dwellings, and the provision by public funds of low-rent housing is only a means by which the main object is to be accomplished. The statute as a whole is designed to serve a public need, and the money expended for low-rent housing, as well as that expended for slum clearance, is for a public

use.   Whether the scheme adopted by the Legislature will work out as intended, and whether the safeguards are sufficient to insure successful operation are not, of course, judicial questions.   We cannot say that the plan is not adapted in a rational manner to bring about a result within the scope of legislative competence.

On two previous occasions this court has dealt with the constitutionality of legislation relating to the provision of housing at public expense.   The proposed statute which was the subject of an adverse opinion in *Opinion of the Justices,* 211 Mass. 624, differed at the critical point from the statute now under discussion.   That proposed statute contained no provision for the eradication of sources of disease and danger.   It was not a slum clearance law.   It did not eliminate unsafe or unsanitary dwellings.   The court said, "The substance of it is that the Commonwealth is to go into the business of furnishing homes for people who have money enough to pay rent and ultimately to become purchasers." 211 Mass. at page 625.   The "dominating design" of that statute was "the furtherance of the advantage of individuals."   Any effect that it might have in preserving the public safety, health, and morals was incidental, remote and doubtful.   The court further said, "It is the essential character of the direct object of the expenditure which must determine its validity . . . ." 211 Mass. at page 626.   The second occasion was in *Salisbury Land & Improvement Co. v. Commonwealth,* 215 Mass. 371.   In that case the statute not only authorized the taking of a beach as a place of public resort, which would have been valid if it had stood alone, but also at the same time authorized the taking and immediate sale or lease of a large number of summer cottages, not required for the beach reservation and intended for private occupation or ownership.   This last mentioned feature of the statute had no relation to the public safety, health, morals, or welfare and rendered the whole unconstitutional.   The case bears little resemblance to the one at bar.

The statute passed upon in *Opinion of the Justices,* 204 Mass. 607, had nothing to do with housing and represented a purely commercial venture.

Our present decision is not inconsistent with the result reached in any previous decision or opinion of this court and is in accord with the principle laid down in them. It also has the practically unanimous support of such decisions in other jurisdictions as have so far become available.*

As soon as it is established that the primary purpose of the statute is a public purpose, the various provisions for the creation of housing authorities, selection of the site, coöperation by municipalities, exercise of the right of eminent domain, and exemption from taxation take their appropriate places as legitimate parts of the entire plan. See *Graves* v. *State Tax Commission of New York,* 306 U. S. 466, 477.

The petitioners assert in their brief that the act is unconstitutional on the ground that no provision is made for notice to the taxpayers of the proposed action of a housing authority or of the State housing board. We do not know of any constitutional requirement that taxpayers be notified of the proposed incurring of obligations by duly constituted public authority. See *Chandler* v. *Railroad Commissioners,* 141 Mass. 208, 213; *Rindge Co.* v. *County of Los Angeles,* 262 U. S. 700, 709.

We hold that the Housing Authority Law is a valid exercise of the broad legislative power granted to the General Court by art. 4, § 1, c. 1 of Part II of the Constitution. We have not found it necessary to consider any possible bearing of arts. 43 and 47 of the Amendments.

*Petition dismissed, without costs.*

---

* *Opinion of the Justices,* 235 Ala. 485. *Willmon* v. *Powell,* 91 Cal. App. 1. *Marvin* v. *Housing Authority of Jacksonville,* 133 Fla. 590. *Williamson* v. *Housing Authority of Augusta,* 186 Ga. 673. *Krause* v. *Peoria Housing Authority,* 370 Ill. 356. *Edwards* v. *Housing Authority of Muncie,* 215 Ind. 330. *Spahn* v. *Stewart,* 268 Ky. 97. *State* v. *Housing Authority of New Orleans,* 190 La. 710. *Rutherford* v. *Great Falls,* 107 Mont. 512. *State* v. *City Council of Helena,* 108 Mont. 347. *New York Housing Authority* v. *Muller,* 270 N. Y. 333. *Wells* v. *Housing Authority of Wilmington,* 213 N. C. 744. *Dornan* v. *Philadelphia Housing Authority,* 331 Penn. St. 209. *McNulty* v. *Owens,* 188 S. C. 377. *Knoxville Housing Authority, Inc.* v. *Knoxville,* 174 Tenn. 76. *Chapman* v. *Huntington, West Virginia, Housing Authority, Inc.* 121 W. Va. 319. *Oklahoma City* v. *Sanders,* 94 Fed. (2d) 323. Compare *United States* v. *Certain Lands in Louisville,* 78 Fed. (2d) 684, and see *Green* v. *Frazier,* 253 U. S. 233.