NILS HOGLUND, ET AL., PLAINTIFFS-APPELLANTS, v.
CITY OF SUMMIT, A MUNICIPALITY OF THE COUNTY
OF UNION, ET AL., DEFENDANTS-RESPONDENTS, AND
SUMMIT CIVIC FOUNDATION, A NEW JERSEY COR-
PORATION, INTERVENING-DEFENDANT.

Argued December 2, 1958—Decided January 5, 1959.

*Mr. Samuel A. Bloom* argued the cause for the plaintiffs-appellants (*Messrs. Harry Silverstein* and *Samuel A. Bloom,* attorneys).

*Mr. Joseph H. Stamler* argued the cause for the defendants-respondents Summit Civic Foundation and City of Summit (*Messrs. Lorentz & Stamler,* attorneys for defendant-respondent Summit Civic Foundation; *Mr. Peter C. Triolo,* attorney for defendant-respondent City of Summit; *Mr. Richard M. Goldman,* on the brief).

The opinion of the court was delivered by

BURLING, J. This is a taxpayers' suit challenging the validity of an ordinance of the City of Summit. The ordinance proposes to lay out, open and establish a street known as Dennis Place, and authorizes the improvement of the street, including the installation of storm and sanitary sewers. The Superior Court, Law Division, entered an order for a summary judgment in favor of the defendant, the City of Summit, and the intervenor defendant, the Summit Civic Foundation. Appellants pursued an appeal to the Superior Court, Appellate Division, and we certified the cause on our motion while pending in that court.

In the course of enforcing an ordinance designed to cause the repair, closing and demolition of dwellings found unfit for human habitation, the City of Summit was confronted with the problem of finding adequate housing for persons obliged to vacate submarginal dwellings. One such building found unfit for human habitation was known as "Weaver Arms," a dilapidated project containing 28 apartments with no provisions for hot water or indoor toilet facilities. Of the families forced to move from Weaver Arms, some moved out of Summit and others doubled up in other substandard dwellings in the city.

In 1956 the mayor of Summit appointed a special committee to study the problem of providing adequate housing primarily for those citizens of the city dispossessed by the enforcement of the substandard housing regulation ordinance. The committee, after reviewing a number of alternatives for achieving its desired ends, finally concluded that the best approach would be to establish a private non-profit corporation to finance, construct and administer a housing project.

On October 9, 1956 seven citizens of the city formed the Summit Civic Foundation, a non-pecuniary profit corporation, pursuant to *Title* 15 of the *Revised Statutes*. The certificate of incorporation provides that in the event of dissolution, the assets of the corporation shall be distributed to a charity in a manner to be determined by its board of

trustees acting in accordance with the objects and purposes of the corporation.

Thereupon the Summit Civic Foundation undertook a campaign to raise funds through subscriptions to 3% interest notes of the Foundation. $89,270 in subscriptions to the notes were obtained from local citizens and religious and charitable groups. At the time of trial nearly $80,000 of the subscriptions were paid.

On May 14, 1957 the Foundation purchased a tract of land fronting on Weaver Street in the City of Summit and located opposite the Weaver Arms, at a cost of $20,018.52. The proposed plan was to erect 14 two-family dwelling houses (duplex type) on lots with a minimum area of 8,000 square feet. The estimated cost of each building was $20,584, which was to be met by funds derived from note subscriptions of $5,584 and $15,000 by a conventional 20-year mortgage at $4\frac{1}{2}\%$ interest. The projected rental was $79.10 per month for each apartment excluding heat and utilities.

The city agreed to accept a deed of dedication of land for street purposes from the Foundation and to open and improve a street, including the installation of storm and sanitary sewers.

The proposed street, "Dennis Place," is to be located entirely within the confines of the tract owned by the Foundation. The proposed new street is in the form of an inverted "L" running at a right angle to Weaver Street and abutting lots owned by the Foundation.

On December 3, 1957 the city council approved and enacted the ordinance here under attack. The ordinance, after reciting the work, conclusions and plans of the special committee appointed to study the question of providing housing for displaced persons, provides for the opening and improvement of Dennis Place and appropriates the sum of $16,500 to meet the estimated costs of the improvement.

The financing arrangements are as follows: An $825 down payment is appropriated and included in the budget of the municipality and the remainder of $15,675 is to be met by the issuance of bonds pursuant to the Local Bond

Law, *R. S.* 40:1–1 to 88. The ordinance further provides that "No part of the cost of said improvement has been or shall be specially assessed on property specially benefitted." The ordinance also contains provisions that no expenditures shall be incurred prior to receipt by the city of a satisfaction bond from the Foundation assuring repayment to the city of any funds expended in the event the Foundation does not complete a minimum of ten dwelling units within two years from the time of the commencement of the improvement of Dennis Place, and further that, in the event the Foundation sells any lot, it shall pay to the city one-fourteenth of the cost of the improvements. The Foundation has tendered to the city a bond in the sum of $20,000 as provided by the ordinance and has agreed to assume liability for the *pro rata* cost of the improvement in the event any of the lots are sold.

The proposed housing project is not exempt from taxation and it is estimated that the tax return to the city will be in the vicinity of $4,000 to $5,000 per year, whereas the current return from the unimproved tract is much smaller.

▮ The initial question is whether a municipality may undertake the opening and improvement of a street and the installation of sewers as a general improvement to be paid for out of tax revenues generally. We think it plain that it may. *N. J. S. A.* 40:56–1 provides in part:

"A local improvement is one, the cost of which, or a portion thereof, *may* be assessed upon the lands in the vicinity thereof benefited thereby.

Any municipality *may* undertake any of the following works as a local improvement; and the governing body thereof *may* make, amend, repeal and enforce ordinances for carrying into effect all powers granted in this section:

a. The laying out, opening or establishing of a new street, alley, or other public highway, or portion thereof.

\*        \*        \*        \*        \*        \*        \*        \*

i. The construction, reconstruction, enlargement or extension of a sewer or drain in, under or along a street, alley or public highway, or portion thereof, or in, under or along any public or private lands; the construction, reconstruction, enlargement or extension of a system of sewerage or drainage or both combined; \*  \*  \*." (Emphasis supplied)

The language authorizing special assessments for certain improvements, including the laying out, opening and establishment of new streets and for sewer improvements, is permissive rather than mandatory. But it is unnecessary to resort to implication. The last sentence of *N. J. S. A.* 40:56–1 clearly supplies the authority to undertake street and sewer improvements as general improvements. It provides:

"* * * Any municipality may undertake *any or all* of the works mentioned in this section as a general improvement to be paid for by general taxation, and any municipality may provide for the maintenance, repair and operation of any or all of said works by taxation whether the same are undertaken as local or general improvements." (Emphasis supplied)

■ That a municipality has a choice of paying for street improvements either by means of general taxation or special assessment has been recognized in several cases. See *Whipple v. Teaneck Tp.*, 135 *N. J. L.* 345 (*E. & A.* 1946) ; *Burstiner v. City of East Orange*, 100 *N. J. L.* 385 (*E. & A.* 1924). The appellants argue that *R. S.* 40:56–42 requires that improvements relating to streets be specially assessed. That act provides in part:

"When proceedings have been commenced under this subtitle by a municipality for laying out, opening, or establishing a new street, * * * and the municipality has become vested with the title to the real estate or interest therein required for such purposes, under this chapter, such proceeding shall be deemed to be a local improvement and assessments for benefits may be made immediately therefor, and the officer or board charged with the assessment for benefits, or a majority of such board, shall make an assessment of the benefits conferred upon any real estate by reason of such improvement *after hearings are held, upon notice in the same way* and manner as provided for in this article in the case of assessments for benefits and awards for incidental damages where no lands are to be taken and the procedure after said assessment shall be the same as provided for in this article."

■ It is urged that *R. S.* 40:56–42 specifically excepts street improvements from the omnibus last sentence of *N. J. S. A.* 40:56–1 previously quoted. In our view *R. S.*

40:56–42 only has application where the municipality elects to undertake the street opening or improvement as a local improvement and does not constitute an express or implied limitation upon the right of a municipality to proceed with "any or all" of the improvements listed in *N. J. S. A.* 40:56–1 as general improvements. This conclusion is made evident by the introducer's statement to *R. S.* 40:56–42. It reads:

"The purpose of this Act is to remove the uncertainty raised by the decision of the Court of Errors and Appeals in the case of *Gross v. Hague* [99 *N. J. L.* 457], 123 *A.* 744, as to the right of municipalities of this State to assess benefits for the laying out, opening or establishing of new streets or the widening, straightening, extending, altering or changing in any manner the location of a street before physical improvements thereof are completed, which was the long established uniform procedure of municipalities in such cases before said decision. Without this act our municipalities would be handicapped in city planning to anticipate the future development of our municipalities."

*Gross v. Hague,* 99 *N. J. L.* 457 (*E. & A.* 1923), held that assessments for benefits arising from a local special improvement could not be made until the improvement had actually been completed. *R. S.* 40:56–42 was designed to specifically empower the municipality to assess for benefits *immediately* after commencing proceedings for opening or improving a street and acquiring title to the lands in question.

The language that "such proceeding shall be deemed to be a local improvement" was utilized to overcome the objection raised by Mr. Justice Katzenbach in *Gross v. Hague, supra,* that the fact of special benefit to abutting property owners could not be determined until the specific improvement was in existence. But we can discern no legislative intention to curtail the broad and generally recognized grant of power contained in the last sentence of *N. J. S. A.* 40:56–1.

Moreover, it should be noted that *R. S.* 40:56–1 was amended in 1951, subsequent to the anactment of *R. S.* 40:56–42 (enacted in 1928), but the last sentence was left unaltered.

548

■ Appellants also rely upon *R. S.* 40:56–52 relating to sewer extension improvements. This statute reads in part:

"When a main sewer or drain, * * * or any improvement or addition to a sewerage system has been or shall hereafter be constructed in a municipality, and the benefits thereof shall be extended to real estate in the municipality by the subsequent construction of any lateral sewer or sewers, drain or drains, and the municipality has paid or is obligated to pay for such main sewer or drain, or sewage disposal plant, or outlet or connecting sewer, or any improvement or addition to the sewerage system or any part of the cost thereof, out of general funds, either because such work has been done at the general expense, or because the assessments therefor did not equal the total cost thereof, such real estate to which the benefits thereof shall have been extended, *may* be assessed therefor to an amount not exceeding the amount of the benefits actually received by such real estate notwithstanding that the municipality shall have paid such indebtedness or part thereof either in whole or in part. Such assessment may be made in connection with and as a part of the assessment for such lateral sewer or drain, or as an independent assessment, and shall be made and collected in accordance with the provisions of this chapter. * * *" (Emphasis supplied)

It is clearly permissive in its import and cannot be read as a limitation of the last sentence of *N. J. S. A.* 40:56–1.

■ The appellants contend that "the ordinance under attack is illegal as part of a schematic attempt to contravene the constitutional limitation prohibiting a municipality from giving any money or property, or loaning its money on credit 'To or in aid of any * * * association or corporation.'" 1947 *Const., Art.* VIII, *Sec.* III, *pars.* 2, 3.

The constitutional provisions referred to were derived from 1875 amendments to the 1844 Constitution, *N. J. Const.* 1844, *Art.* I, *pars.* 19 and 20, which in turn were patterned after the provisions of the constitutions of the western states designed to prohibit governmental grants to railroads. *Carr v. Borough of Merchantville,* 102 *N. J. L.* 553 (*Sup. Ct.* 1926).

■ The basic test is whether the municipal action under attack may fairly be characterized as primarily a public one. *Lynch v. Borough of Edgewater,* 8 *N. J.* 279 (1951); 15 *McQuillin, Municipal Corporations* (*3d ed.* 1950), § 39.30.

In the instant case we can perceive no violation of the constitutional proscription against gifts or the lending of credit by municipal corporations. The public moneys are to be expended for the opening and improvement of a public street—an activity which has been characterized as governmental in nature. See *Truhlar v. Borough of East Paterson,* 4 *N. J.* 490 (1950). It is true that the opening and improvement of Dennis Place will specially benefit the Foundation, but, to a greater or lesser degree, any new street benefits the abutting owners by providing access to and hence enhancing the value of the property. The same is, of course, true with storm and sanitary sewer facilities. Such special benefits to the abutting owners do not cause an otherwise authorized governmental activity to run afoul of the constitutional provisions relating to donations of public moneys. See *Simon v. O'Toole,* 108 *N. J. L.* 32 (*Sup. Ct.* 1931), affirmed 108 *N. J. L.* 549 (*E. & A.* 1932). A similar point was made by the court in *Allydonn Realty Corp. v. Holyoke Housing Authority,* 304 *Mass.* 288, 292, 293, 23 *N. E.* 2d 665, 667 (*Sup. Jud. Ct.* 1939):

"The distinction between a use or service which is public and therefore a proper object of governmental expenditure and one which is private and therefore an improper object to which to devote money belonging to all of the people has been discussed at length in its application to various situations in a number of instances coming before this court. [citing cases] Some of these cases have become generally recognized as leading cases. They do not, however, establish any universal test. Each case must be decided with reference to the object sought to be accomplished and to the degree and manner in which that object affects the public welfare. Frequently an object presents a double aspect in that it may in some respects result in conferring a benefit upon the public and in other respects it may result in conferring a benefit upon or in paying money to private individuals. In such instances the cases tend to distinguish between those results which are primary and those which are secondary or incidental and to classify the object according to its primary consequences and effects. At any rate it is plain that an expenditure is not necessarily barred because individuals as such may profit, nor is it necessarily valid because of incidental benefit to the public."

Many municipal actions benefit certain locales more than others, but it cannot be said that such fact renders the

action taken unconstitutional. This may be true, for instance, of the location of a new fire station, a new pumping station, the extension of sewerage facilities or the addition of a policeman to patrol a certain sector of the municipality. To hold otherwise with respect to the proposed street involved in the instant case would be to render meaningless the conclusion previously arrived at, *i. e.,* that a municipality has a governmental discretion to determine whether a street may be opened and improved as a general or local improvement.

For purposes of the constitutional objection raised by the appellant we find it unnecessary to determine whether the admitted public purpose of the Foundation to provide housing for persons displaced by the enforcement of the substandard housing ordinance provides an additional prop to support the municipality's action. We need not speculate, in the instant case, on the question of whether a municipality may make a donation in the form of money, credit or by any other means which are not in themselves proper governmental activities, to a private charitable enterprise. For a collection of cases on this subject see 15 *McQuillin, Municipal Corporations* (*3d ed.* 1950), § 39.30, at *n.* 80.

The public purpose of the Foundation as a motivation for the municipal action has relevancy, if at all, only to the question of whether the municipality abused its discretion in choosing to open and improve Dennis Place as a general rather than a local improvement.

The conclusion reached herein is supported by the decision of *Simon v. O'Toole, supra.* In the *O'Toole* case, the City of Newark executed a contract with the Prudential Insurance Company. The contract provided that the Prudential was to purchase two entire blocks in the City of Newark and was to erect thereon modern housing facilities. The city agreed to repurchase some of the lands from Prudential at a cost not to exceed $1,200,000 for the purpose of creation of parks and playgrounds. The ordinance recited the desire of the city that: "In the interest of the public health, safety and morals certain blocks of unsafe and unsanitary dwell-

ings * * * should be replaced in part by new housing facilities constructed in accord with proper standards of sanitation and safety and provided with appropriate parks and playgrounds." Certain taxpayers in the city attacked the ordinance on the grounds, *inter alia,* that: "(1) the ordinance contemplates the expenditure of public funds for a private purpose in aiding the Prudential to carry out the housing plan in question. (2) The ordinance constitutes an abuse of discretion by the commissioners because (a) the price to be paid by the city for the acquisition of the lands is greatly in excess of their true value, and because (b) the lands to be acquired by the city are wholly unsuitable for the purpose of a public park and will not in fact be used as such."

In passing upon the constitutional object, Mr. Justice Trenchard observed:

"The prosecutors urge that, because the commissioners admittedly were moved to their judgment to purchase the land in question for parks and playgrounds by a consideration of the incidental benefit to the public that would result from construction of the housing facilities, the motive for their action vitiates the legality of the purchase. But we think that this view confuses the motive for the action with the character of the action itself. The legality of legislative action directed towards an admittedly public purpose cannot depend upon whether or not particular benefit may result to property and individuals in the immediate neighborhood.

In support of the charge that the effect of the ordinance is to permit the use of public funds for other than a public purpose in violation of constitutional provisions the prosecutors cite among other cases: *In re Opinion of the Justices,* 211 *Mass.* 624, 98 *N. E.* 611, 42 *L. R. A., N. S.,* 221; *In re Opinion of the Justices,* 204 *Mass.* 607, 91 *N. E.* 405, 27 *L. R. A., N. S.,* 483; *City of Boston v. Talbot,* 206 *Mass.* 82, 91 *N. E.* 1014, 1015; *Salisbury Land & Improvement Co. v. Commonwealth,* 215 *Mass.* 371, 102 *N. E.* 619, 46 *L. R. A., N. S.,* 1196.

But we think that none of these decisions are dispositive of the present case for the reason that they are concerned only with the question whether a particular use is or is not a public use.

\* \* \* \* \* \* \* \*

It is of course conceded by the prosecutors that the devotion of lands to public parks and playgrounds constitutes a public use. It is their contention that the true purpose of the ordinance under review is not to provide parks and playgrounds. In support of this

position it is idle to cite decisions adjudicating upon the nature of a public use." (108 *N. J. L.* 37, 38, 39)

So here, the public moneys have been expended for a public purpose expressly authorized by statute, *i. e.,* the opening and improvement of a street and the installation of sewerage facilities.

We come, then, to the question of whether the opening and improvement of Dennis Place, to be ultimately paid for out of general tax revenues, involves an abuse of the power to undertake general improvements. The authorities universally recognize that municipalities have a wide latitude of discretion with respect to public improvements and that the courts will not interfere with the legislative judgment in the absence of fraud or palpable abuse of discretion. See *e. g., Borough of Paramus in Bergen County v. Bergen County,* 25 *N. J.* 492 (1958); *Simon v. O'Toole, supra; Suburban Land & Improvement Co. v. Borough of Vailsburg,* 67 *N. J. L.* 461 (*Sup. Ct.* 1902), affirmed 68 *N. J. L.* 311 (*E. & A.* 1902); *Oakley v. City of Atlantic City,* 63 *N. J. L.* 127 (*Sup. Ct.* 1899); *Atlantic City Water-Works Co. v. Atlantic City,* 48 *N. J. L.* 378 (*Sup. Ct.* 1886); 13 *McQuillin, supra,* § 37.25; 63 *C. J. S. Municipal Corporations* § 1043. The decision, if there be any reasonable basis to support it, is conclusive. *Tidewater Company v. Coster,* 18 *N. J. Eq.* 518 (*E. & A.* 1866); *Pope v. Town of Union,* 18 *N. J. Eq.* 282 (*Ch.* 1867). Ultimate review of the expediency of the improvement is generally to be had at the polls. Given a discretion to choose between a local or general improvement, a municipality may be led to the latter choice by an infinite variety of reasons, not the least of which is the one advanced, *i. e.,* that the ultimate benefit from the improvements will redound to the municipality as a whole. Such is the reasoning of the court in *Simon v. O'Toole, supra,* and we can perceive no reason for departing from that view, under the circumstances of this case.

The appellants further contend that the ordinance is invalid for the reason that the Legislature, in enacting

Local Housing Authorities Law, *N. J. S. A.* 55:14*A*–3.1 *et seq.;* Housing Co-operation Law, *N. J. S. A.* 55:14*B*–2 *et seq.;* National Defense Housing Projects Law, *N. J. S. A.* 55:14*C*–1 *et seq.;* Redevelopment Companies Law, *N. J. S. A.* 55:14*D*–1 *et seq.;* Urban Redevelopment Law, *N. J. S. A.* 55:14*E*–1 *et seq.;* Municipal Housing Law, *N. J. S. A.* 55:14*F*–1 *et seq.;* Veterans Housing Law, *N. J. S. A.* 55:14*G*–1 *et seq.;* State Housing Law, *N. J. S. A.* 55:14*H*–1 *et seq.;* Limited Dividends Housing Corporations Law, *N. J. S. A.* 55:16–1 *et seq.;* Redevelopment and Regional Development Agencies Law, *N. J. S. A.* 40:55*C*–1 *et seq.,* has pre-empted the field of public housing. Without deciding that question that argument may be summarily disposed of with the observation that it is the Foundation, a private non-profit corporation, that is financing and erecting the housing project, and not the municipality, so that the pre-emption doctrine has no application here. As with the constitutional gift argument, the motivation of the municipality should not be confused with the form of the action it has undertaken.

Lastly, it is urged that the ordinance is invalid under the doctrine enunciated in *Spoerl v. Pennsauken Township,* 14 *N. J.* 186 (1954). The *Spoerl* case deals with the problem of the exemption from special assessments of persons dedicating land to a municipality for public improvement purposes. The reasoning enunciated there is predicated on the premise that the municipality has undertaken the improvement as a local one, and has exempted some abutting property owners from special assessments, but not others. It has no application where, as here, the improvement is initially undertaken as a general one.

For the reasons advanced in this opinion the judgment appealed from is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*For reversal*—None.